STONE, CHAIRMAN OF STATE TAX COMMISSION, *v.* GENERAL
ELECTRIC CONTRACTS CORPORATION.

(In Banc. April 27, 1942. Suggestion of Error Overruled June 8,
1942.)

[7 So. (2d) 811. No. 34987.]

Greek L. Rice, Attorney-General, by Geo. H. Ethridge, Assistant Attorney-General, J. H. Sumrall, of Jackson, and R. W. Heidelberg, of Hattiesburg, for A. H. Stone, Chairman State Tax Commission.

**Watkins & Eager,** of Jackson, for General Electric Contracts Corporation.

Argued orally by **R. W. Heidelberg, J. H. Sumrall** and **Geo. H. Ethridge,** for appellant, and by **W. H. Watkins,** for appellee.

**McGehee, J.,** delivered the opinion of the court.

This suit is brought to test the constitutionality of Chapter 110, Laws of 1940, and to recover from the ap-

pellant certain taxes paid under protest by the appellee pursuant thereto. The case is controlled in all of its essential features by the decision rendered on this day in Cause No. 34958, A. H. Stone, Chairman of State Tax Commission v. General Contract Purchase Corporation, 193 Miss. 301, 7 So. (2d) 806; and this is true notwithstanding the fact that the appellee in the case at bar has not filed its corporate charter nor qualified to do business in the State of Mississippi within the meaning of Section 4140, Code of 1930, as a foreign corporation, and is not doing business in this state within the construction given that term as found in said statute and construed in the cases of North American Mortgage Co. v. Hudson, 176 Miss. 266, 168 So. 79; C. I. T. Corporation v. Stuart, 185 Miss. 140, 187 So. 204; Refrigeration Discount Corp. v. Turley, 189 Miss. 880, 198 So. 731, and the very recent case of Yellow Mfg. Acceptance Corporation v. American Oil Co., 191 Miss. 757, 2 So. (2d) 834; and this is likewise true without regard to the fact that appellee neither maintains an office nor has an agent in its employ in Mississippi who is vested with executive authority to finally consummate the purchase, discount or other acquisition of the notes, trust receipts, installment sales contracts, and other forms of indebtedness, whereby title is retained as security for the unpaid purchase price of tangible personal property located in this state, in connection with the business in which said appellee "finance company" is engaged, and which the legislature has defined as "doing business" in this state in Chapter 110, Laws of 1940, wherein the tax here involved is levied for the privilege of conducting such a business, applicable alike to finance companies acquiring such securities through their offices and agents located and residing in the state and to those with offices and agents outside the state who acquire the ownership and come into possession of such securities under similar terms and conditions through local dealers in the state in the manner hereinafter mentioned.

In addition to what is said in the companion case of A. H. Stone, Chairman, etc., v. General Contract Purchase Corporation, supra, as grounds for upholding the validity of said Chapter 110, Laws 1940, and the constitutional right of the legislature to impose the tax upon the privilege of engaging in the activities therein defined, as "doing business" in the state without regard to whether the securities which constitute the measure of the tax are acquired by a finance company which has an office and agent in Mississippi to receive them or on the other hand are sent to or delivered and accepted at the New Orleans or Memphis office of a finance company having no office in this state, as in the case here under consideration, it should perhaps be stated that the proof in the present case discloses that in accordance with the general plan substantially followed by each of the several finance companies involved in the different appeals now pending before the court for decision, as discussed in the briefs presented by the various counsel, a dealer in Mississippi engaged in selling at retail the kind of tangible personal property designated in the statute, and who desires to avail himself of the facilities offered by the appellee, makes written application for the privilege of doing so, on a form furnished by such finance company for that purpose, and which is executed in some instances at the personal solicitation of a field representative of the company; that thereupon the financial standing, business ability and credit of the dealer is investigated by the finance company, and, if approved, the dealer is furnished with printed forms of the notes, installment sales contracts or other evidences of indebtedness which are to be executed by the purchaser of such tangible personal property for any unpaid portion of the purchase price thereof in compliance with a rate chart and terms of payment theretofore prescribed and approved by the finance company, one copy of which installment sales contract, retaining title until the purchase

price is fully paid, is printed so as to read: "For General Electric Contracts Corporation," the duplicate delivered to the buyer and the triplicate retained by the dealer; that the original contract, bearing the endorsement of the dealer, is then mailed or otherwise delivered by the dealer to the out of state office of the finance company, as contemplated by the parties when the business relationship was previously established between the dealer and the finance company as the result of his application to be allowed the use of its facilities in that behalf and the approval of his credit and financial ability, in advance of the sale, to comply with his agreement to repurchase the paper in the event of default in payment by the customer; and that the appellee upon acquiring the possession of such retain-title installment sales contracts in the manner and under the terms and conditions prescribed by it before the sale, pays for the same from the out of state office to which the same was sent. And, although it was shown that the Memphis or New Orleans office of the finance company had the right to reject such a contract and decline to pay for the same upon its arrival, the proof fails to mention any instance of this being done in regard to any retail installment sales contract executed on the forms prescribed by appellee and covering the class of property contemplated under the business relationship established between the parties in advance as hereinbefore mentioned. At any rate, it was shown that during the period from May 30, 1940, to June 1, 1941, for which the privilege tax is here claimed, the appellee purchased installment sales contracts on tangible personal property located in Mississippi amounting to $668,723.18, and paid under protest a total of only $1,320.03 in taxes of any kind or character to the state for the support of the government which sustains the value of such securities and affords protection to the enormous business in which appellee and the other finance companies are engaged, amounting to many million dollars annually.

Included in the amount of business done by the appellee during the period in question, it frequently financed purchases made by dealers in General Electric products who desired shipments thereof on the wholesale or "floor plan" whereby the manufacturer or distributor procures for the finance company at the time of the delivery of the shipment to the dealer a "trust receipt," executed by the dealer on a printed form furnished by the finance company, stating that the dealer has received from the factory or distributor "acting for the General Electric Contracts Corporation, the Entruster, the following described products" (describing them) and that "the undersigned hereby acknowledges that the above products are the property of the General Electric Contracts Corporation . . .," and that the dealer may "sell said property for account of General Electric Contracts Corporation, to a bona fide purchaser at retail for cash, for not less than the sum indicated in column 6 on the reverse side hereof as to each product covered hereby, and immediately after such sale, the undersigned shall deliver the proceeds thereof to General Electric Contracts Corporation . . ." The original of this trust receipt is printed so as to read "For General Electric Contracts Corporation," the duplicate is for filing, and the triplicate is retained by the dealer. After this instrument is acquired from the dealer in Mississippi at the instance of the factory or distributor "acting for the General Electric Contracts Corporation" as aforesaid, and is then sent to the said finance company, the purchase price of the wholesale shipment is paid to the factory or distributor by the finance company. Under the terms of the trust receipt above mentioned, the finance company may at any time examine the property and the books and records of the dealer with reference thereto, and may take possession of the property without notice or demand, and for such purposes, it or its representatives may enter the premises of the dealer at any time without legal

process in order to repossess the property described in such trust receipt, which stipulates that the property has been shipped and delivered to the dealer by or pursuant to instructions from the finance company to be held in trust for sale as its property.

The proof also discloses that the appellee has in its employ a representative, B. G. Grant, who lives at Jackson, Mississippi, and whose primary duty is that of making delinquent collections in Mississippi from the retail purchasers under these installment sales contracts, but he is also authorized to call upon dealers ''for the purpose of soliciting additional business'' from them. And it also appears from the proof that the dealers themselves are authorized to receive payments and make remittances to the out-of-state office of the finance company on these retail installments sales contracts, and they are furnished printed forms by the finance company for use in making such remittances although not specifically required to collect any of the installments due under the contracts.

It is further shown that pursuant to the authority conferred by the terms of the trust receipt, it is the practice of the finance company to have its field representative check the property on the floor of the dealer from time to time to ascertain its condition and location, etc. Upon a breach by the dealer of any of the conditions of the trust receipt as to the prompt remittance of the proceeds of any retail sale, the finance company may repossess such property as remains on the floor of the dealer and require the manufacturers or distributor to save harmless the finance company under the repurchase agreement theretofore entered into between them.

Therefore, in determining the amount of tax to be levied for the privilege of conducting such a business on both the retail and wholesale plan, the legislature was entitled to consider the ability of the finance companies, when operating a business of such magnitude, to obtain

money at a low rate of interest in the money centers of the country with which to purchase such notes, installment sales contracts and other evidences of indebtedness whereby the title to the property sold was to be retained until the purchase price is fully paid, and to estimate the profits to be made from the discount of such paper when added to the rate of interest to accrue thereon. When the benefits to be received from such a business are so considered, together with the protection afforded by the courts of the state for the enforcement of such securities on the tangible personal property located in the state, it cannot be said that the levying of the tax of one-fourth of one percent of the volume of retail installment sales contracts purchased and one-eighth of one percent on the volume of business done on the wholesale financing plan is an unreasonable exercise of the taxing power. Nor can it be said that such a tax imposes an undue burden upon interstate commerce when it applies alike to such a business when conducted by a finance company with offices and agents located in the state, and to those companies whose offices and agents are wholly without the state. Moreover, it is to be noted from the facts hereinbefore stated that the finance companies are not engaged in the business of selling or shipping any commodities in interstate commerce. They are doing the business of acquiring securities representing the unpaid purchase price of the tangible personal property sold and shipped by others in interstate commerce, and they acquire such securities relating to both retail and wholesale sales of such property after the transportation thereof in interstate traffic has been completed. But, assuming that the mailing of the securities from the office of the dealer in Mississippi to the office of the finance company outside the state should be deemed the transaction of business in interstate commerce, the fact remains that the tax here in question is not a tax on the particular transactions. whether they

took place in the State of Mississippi in interstate commerce, or wholly without the state, but the tax is on the privilege of engaging in those activities which are defined in the statute, Chapter 110, Laws of 1940, supra, as doing business in the state. But, without regard to this consideration, attention should be called to the fact that in the recent case of McGoldrick v. Berwind-White Coal Mining Co., 309 U. S. 33, 60 S. Ct. 388, 391, 84 L. Ed. 565, 128 A. L. R. 876, the court said: "Forms of state taxation whose tendency is to prohibit the commerce or place it at a disadvantage as compared or in competition with intrastate commerce and any state tax which discriminates against the commerce, are familiar examples of the exercise of state taxing power in an unconstitutional manner, because of its obvious regulatory effect upon commerce between the states. But it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business . . . Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless falls far short of the regulation of the commerce which the Constitution leaves to Congress. A tax may be levied on net income wholly derived from interstate commerce. Non-discriminatory taxation of the instrumentalities of interstate commerce is not prohibited. The like taxation of property, shipped interstate, before its movement begins, or after it ends, is not a forbidden regulation. An excise for the warehousing of merchandise preparatory to its interstate shipment or upon its use or withdrawal for use, by the consignee after the interstate journey has ended is not precluded."

And with reference to the particular statute there in question, it said: "The present tax as applied to respondent is without the possibility of such consequences. Equality is its theme . . . It does not aim at or discriminate against interstate commerce."

Also, in the case of State of Wisconsin v. J. C. Penney Co., 311 U. S. 435, 61 S. Ct. 246, 249, 85 L. Ed. 267, 130 A. L. R. 1229, the Supreme Court of the United States further said:

"A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society. . . .

"The simple but controlling question is whether the state has given anything for which it can ask return. The substantial privilege of carrying on business in Wisconsin, which has here been given, clearly supports the tax, and the state has not given the less merely because it has conditioned the demand of the exaction upon happenings outside its own borders. The fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction."

However, it is contended by the appellee finance company that because banks, state and national, are excepted from the tax imposed by the statute here under consideration, and that merchants selling from their regular stocks and taking securities on tangible personal property located in Mississippi are exempt from the tax, the statute is unconstitutional and void. But, as stated in the companion case of A. H. Stone, Chairman of State Tax Commission, v. General Contract Purchase Corp., hereinbefore referred to, the invalidity of these exemp-

tions, if such exists, would not render the statute unconstitutional as to the tax levied against the appellee. Adams v. Standard Oil Co. of Kentucky, 97 Miss. 879, 53 So. 692; Enochs v. State, 133 Miss. 107, 97 So. 534; Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596, which cites the case of State ex rel. Knox v. Gulf, M. & N. R. Co., 138 Miss. 70, 104 So. 689, with reference to which the Annotator said: "A void exemption or inapplicable provision of an income tax law may be stricken from a statute without affecting the remainer thereof, both under the general rule for construing statutes, and the express provisions therefor in the act itself."

But as to whether the classification adopted by the legislature is discriminatory in imposing the tax upon the finance companies for the privilege of engaging in the business defined by the statute and excepting the banks and local merchants from the payment thereof or is based upon a reasonable distinction, it should be observed that Section 181 of the Constitution of Mississippi of 1890 recognizes the authority to provide by statute a different method of assessing banks than that for assessing other corporations and individuals; and the right of the legislature to enact statutes based upon this constitutional classification has been upheld in the following cases: Magnolia Bank v. Pike County, 111 Miss. 857, 72 So. 697, 3 A. L. R. 1365; see Id., 248 U. S. 546, 39 S. Ct. 135, 63 L. Ed. 414; First National Bank v. Harrison County, 157 Miss. 197, 127 So. 686; Union Bk. & Tr. Co. v. Phelps, 288 U. S. 181, 53 S. Ct. 321, 77 L. Ed. 687, 83 A. L. R. 1438; Welch v. Henry, 305 U. S. 134, 59 S. Ct. 121, 83 L. Ed. 87, 118 A. L. R. 1142. Moreover, it is not contemplated that a bank will in every instance obtain a profit in excess of the maximum legal rate of 8% interest per annum, while the finance company may discount these installment sales contracts so as to obtain a return, including the interest to accrue, which may amount to a

profit far in excess of that usually obtained by the banks; and the local merchants are otherwise required to pay a privilege tax based upon the value of the stock of merchandise employed in their business, which is equivalent to the privilege tax levied against the finance companies under the statute now before us. Again, the merchant who takes security on the tangible personal property sold by him, for the purchase price thereof, can in no event make a profit on the paper itself in excess of the maximum legal interest rate of 8% per annum. He does not get the paper at a discount and thereby make a profit in excess of the interest to accrue thereon, and if he obtains a return of interest in excess of 6% per annum, the note is subject to an ad valorem tax.

There is no issue here involving the right of the Tax Commissioner to collect the tax in question from either a resident or non-resident bank engaged in the business of purchasing, discounting or otherwise acquiring the notes, installment sales contracts, etc., mentioned in the statute under consideration, and it is, therefore, unnecessary to decide the constitutional validity of such exemption in order to uphold the tax as applied to the finance companies. But even if this were not the case, then we find that the proof taken upon the trial and the arguments made in the briefs of counsel as to the amount of such business done by the banks are limited to those located in this state, all of which are subject to state supervision and control and have physical assets here which are made to bear their rightful share of the burden of ad valorem and other taxes required for the support of the state government in return for the right to do a general banking business, in connection with which the purchase of these installment sales contracts, etc., is a mere incident; and most assuredly there is some reasonable basis for the distinction complained of as between the finance companies and these banks.

Moreover, the question of classification is primarily for

the legislature, and it does not become a judicial question except for the purpose of determining whether the legislative action is clearly unreasonable, and when a classification is called in question the courts will·presume that the legislature acted on legitimate grounds of distinction, if any state of facts reasonably can be conceived that would sustain it, and the courts will not require the legislature to specify its reasons for the classifications, even if the same are not obvious. In support of this well settled principle, see the case of Miller v. Lamar Life Ins. Co., 158 Miss. 753, 131 So. 282, citing with approval and quoting from the case of Royster Guano Co. v. Commonwealth of Virginia, 253 U. S. 412, 40 S. Ct. 560, 64 L. Ed. 989; also the recent case of Russell Investment Corp. v. Russell, 182 Miss. 385, 178 So. 815, 182 So. 102.

The other questions raised in the briefs of counsel for the appellee as to the alleged invalidity of the tax are decided adversely to its contentions in the companion case of A. H. Stone, Chairman of State Tax Commission, v. General Contract Purchase Corp., 193 Miss. 301, 7 So. (2d) 806.

In our opinion the decree of the court below in favor of the appellee for the recovery of the tax paid for the period in question, and which enjoins the appellant from paying the tax into the state treasury should be reversed, the injunction dissolved and the bill of complaint dismissed. It is so ordered.

Reversed and judgment here for the appellant.

**Alexander, J.**, delivered a dissenting opinion.

This case furnishes occasion to apply the distinction urged in the specially concurring opinion in Stone, Chairman, v. General Contract Purchase Corporation, 193 Miss. 301, 7 So. (2d) 806, this day decided, wherein the view was expressed that since the appellee was doing business in this state and therefore liable to privilege tax therefor

there was no need to consider whether the paper or securities were purchased within or without the state such being merely a basis for computing the amount of the tax. The instant case, however, fixes attention upon the status of appellee as a non-resident transacting its business in interstate commerce. To allow imposition of a privilege tax here would mean that the factors by which the extent of liability was to be calculated were employed to fix the liability itself.

It would seem elemental that while the legislature could regulate certain incidents of such business, it could not prevent its conduct and is therefore impotent to require prepayment of a privilege tax therefor. If the non-resident is to enjoy an untrammeled commerce it is fatuous to seek to justify the taxation of such commerce by an alleged vouchsafing of equal protection and privileges which the state is without power to withhold. The right to solicit business, to exact security for its advances, to seek the aid of the courts in enforcing obligations, or to maintain a supervision in the exercise of business caution is indeed valuable but not valuable consideration. I need not elaborate the point given prominence in the majority opinion, that the appellee, but for the tax would enjoy an annual gross business of over half a million dollars derived from our citizens without paying for such privilege. The obverse of this proposition is that such amount could as aptly be seen as the measure of benefits accorded our citizens by the appellee whose funds are at the request of these citizens, drawn into our state for their assistance. However, I dismiss these considerations as irrelevant to the merits of the case. Nor is the size or wealth of the non-resident corporation relevant nor the amount of its business except as a factor in computing the amount of the privilege tax for which the corporation has theretofore otherwise become liable. I do not decry the growing tendency to enlarge the expanding areas of state taxation nor seek to impede the accession of state power to exact revenue upon the basis of

benefits which it has accorded to corporations function-
ing by its leave, but I am unable to see in any of our
modern decisions any warrant for the re-definition by
our own legislature of interstate commerce. The cases
selected by appellee as bases for its contentions seem not
to have undergone thorough inspection for their stability
to this end. In Stone v. Interstate Natural Gas Co., 5 Cir.,
103 F. (2d) 544, the appellee was duly authorized to do
business in this state. The transactions incident to such
privilege were held to be legitimate bases for the calcu-
lation of the tax, liability for which having arisen because
it elected to engage in business in the taxing state. This
case may be contrasted with State Tax Commission v.
Interstate Natural Gas Co., 284 U. S. 41, 52 S. Ct. 62, 76
L. Ed. 156, where the same appellee was held immune to
a state privilege tax for selling to distributors in this
state natural gas piped from another state as being a
burden on interstate commerce.

It is likewise important to note that in the following
cases relied upon by appellant the taxpayer was formally
admitted to do business in the taxing state: Butler Bros.
v. McColgan, 62 S. Ct. 701, 86 L. Ed. 991; Nelson v. Sears,
Roebuck & Co., 312 U. S. 715, 61 S. Ct. 803, 85 L. Ed. 1145;
State of Wisconsin v. J. C. Penney Co., 311 U. S. 435,
61 S. Ct. 246, 85 L. Ed. 267, 130 A. L. R. 1229; Great A. &
P. Tea Co. v. Grosjean, 301 U. S. 412, 57 S. Ct. 772, 81
L. Ed. 1193, 112 A. L. R. 293; Southern Natural Gas Co.
v. State of Alabama, 301 U. S. 148, 57 S. Ct. 696, 81 L. Ed.
970; and other cases cited by counsel. I find more in point
those cases where the initial liability was imposed upon
a non-resident admitted to do business in the taxing
state despite the incident of proposed sales of its manu-
factured products in interstate commerce. Among these
are Jackson Fertilizer Co. v. Stone, 173 Miss. 183, 162
So. 170; Southern Package Corp. v. State Tax Commis-
sion, 174 Miss. 212, 164 So. 45; Compress of Union v.
Stone, 188 Miss. 49, 193 So. 329; Aponaug Mfg. Co. v.
State Tax Commission, 190 Miss. 805, 1 So. (2d) 763;

Stone v. Green Lbr. Co., 191 Miss 414, 1 So. (2d) 764. It was said in State of Wisconsin v. J. C. Penney Co., supra [311 U. S. 435, 61 S. Ct. 250, 85 L. Ed. 267, 130 A. L. R. 1229], that "The substantial privilege of carrying on business in Wisconsin, *which has here been given*, clearly supports the tax." (Italics supplied)

In Stone v. Interstate Natural Gas Co., supra [103 F. (2d) 548], the franchise tax was computed with reference to the amount of capital used, invested, or employed in the state by corporations "now, or hereafter doing business within this state." It is true that in the Act there involved (Ch. 121, Laws 1934) a new meaning was sought to be given to the phrase "doing business," referred to by the court as "the Legislature's queer definition" and that a similar enlargement of its meaning is incorporated in the Act here involved (Sec. 5, Ch. 110, Laws 1940). Yet it may well be doubted whether the conventional meaning can be expanded without impairing constitutional limitations. It seems clear that this section will have to enlarge the conventional definition if the state is held to have the right to impose a privilege tax upon a non-resident which has contracts submitted to it through the mail and maintains no agency in this state. Section 5, when stripped of unnecessary detail, is as follows: "Doing business . . . include[s] . . . every act . . . incident to . . . the lending of money . . . secured . . . by liens on . . . personal property located in the state . . . and the enjoyment of . . . every right [on] which . . . the state . . . can lawfully levy and collect a privilege tax." In other words, the legislature sought to include in the definition the doing of any act which it has the right to tax. It does not enlarge the legal definition of what it has the right to tax nor does it in fact enlarge the definition of "doing business" since the mere fact that an act may be incident to the business of buying negotiable paper cannot change the interstate transaction into an intrastate one. Section 5 therefore merely is an explanation

by the legislature as to why it felt justified in taxing the privilege of purchasing such contracts, even as in Section 1 it explains that "the amount of said tax to bear a direct relationship to the value of the securities . . . acquired . . . and exacted in return for the protection afforded by the . . . state in the enjoyment of such ownership and rights acquired thereby."

In the case last cited appellee had installed, owned and used a pipe line in the State of Mississippi. Analogy was drawn to the right to tax non-residents for the use of our highways. In the instant case the appellee does not own property in the state. Its rights in the personal property made collateral security for obligations due it is inchoate and may never ripen into absolute ownership by foreclosure. In such latter event its ownership would become a mere incident of its primary interstate business and effect no change in its liability or status. Yellow Acceptance Corp. v. American Oil Co., 191 Miss. 757, 2 So. (2d) 834, and cases cited. We have held that the tax is not a property tax. Stone v. General Contract Purchase Corp., 193 Miss. 301, 7 So. (2d) 806, this day decided. The property acquired and owned by appellee—"notes, trust receipts, or other forms of indebtedness"—are in normal course acquired and owned outside the state.

Reliance by the Court upon McGoldrick v. Berwind-White Coal Min. Co., 309 U. S. 33, 60 S. Ct. 388, 394, 84 L. Ed. 565, 128 A. L. R. 876, does not appear to be justified. This case involves imposition of a sales tax upon transactions consummated within the taxing state. Such transactions were insulated against contract with interstate commerce by viewing the tax as applying only to sales upon "merchandise . . . transported in interstate commerce and brought to its journey's end." That the interstate aspect of the business was out of the picture is shown by the court's observation that "Apart from these more fundamental considerations which we think are of controlling force in the application of the commerce clause, we can find no adequate basis for dis-

tinguishing the present tax laid on the sale or purchase of goods upon their arrival at destination at the end of an interstate journey from the tax which may be laid in like fashion on the property itself.'' It is further clear that the court was solicitious to avoid impairment of the immunity of interstate commerce by stating: ''Certain types of tax may, if permitted at all, so readily be made the instrument of impeding or destroying interstate commerce as plainly to call for their condemnation as forbidden regulations. Such are the taxes already noted which are aimed at or discriminate against the commerce or impose a levy for the privilege of doing it, . . .''

The bother of the matter is that, if Section 5 of Ch. 110, Laws 1940, is allowed to enlarge the conventional meaning of doing business so as to include the acquisition by a non-resident of commercial paper, from citizens of this state, it not only redefines doing business but also interstate commerce. It should be evident that this court has allowed the legislature to repeal a long line of decisions defining what constitutes doing business in this state. Among these are Yellow Mfg. Acceptance Corp. v. American Oil Co., supra; Refrigeration Discount Corp. v. Turley, 189 Miss. 880, 198 So. 731; Wiley Electric Co. v. Electric Storage Battery Co., 167 Miss. 842, 147 So. 773; Marx & Bensdorf, Inc., v. First Joint Stock Land Bank, 178 Miss. 345, 173 So. 297; Dodds v. Pyramid Securities Co., 165 Miss. 269, 147 So. 328; North American Mortg. Co. v. Hudson, 176 Miss. 266, 168 So. 79; C. I. T. Corp. v. Stuart, 185 Miss. 140, 187 So. 204; Union Cotton Oil Co. v. Patterson, 116 Miss. 802, 77 So. 795; City Sales Agency v. Smith, 126 Miss. 202, 88 So. 625; Harleston v. West Louisiana Bank, 129 Miss. 111, 91 So. 423; Item Co., Ltd., v. Shipp, 140 Miss. 699, 106 So. 437; Smith v. J. P. Seeburg Corp., 192 Miss. 563, 6 So. (2d) 591.

I assent to the contention of counsel that the legislature may deliberately give to words a meaning at variance with or, indeed, opposite to their usual connotation. It may define as black that which is white. Yet this is

true only where it has the right to deal freely with that which theretofore was white. It may not disguise interstate commerce in the vestments of that which is intrastate and justify a domination thereof. That we may discover how far afield from the foregoing decisions we are being led let us support that a non-resident motor company in Michigan shipped its automobiles to individual purchasers here. There could be imposed no privilege tax for such transaction. Add the elements of personal solicitation of orders by salesmen to be transmitted to and accepted in Michigan; add the incidents of sales on deferred payments with retained liens as security; include further the right of the seller to enforce collection by foreclosure or the use of our courts. Finally let the process become more complex until it reaches the intricacies of the instant procedures. At what stage has the process ceased to be interstate commerce and when has it begun to do business in this state so as to require the filing of its charter? Does not the constant factor of its non-residence and its employment of interstate commerce for its negotiation, purchase and collection persist to control its non-liability? There is an important distinction between getting business from and doing business in this state.

No one could doubt that the cases last cited are infused with the principle that to compel the non-resident to domesticate or file its charter in this state before bringing suit would constitute an unwarranted interference with interstate commerce. This is but another phase of the truth that such companies are not liable for the privilege tax because not doing business here. The "queer definition" in section 5 of the Act therefore either fails to enlarge the conventional meaning of doing business or by doing so illegally restricts the definition of interstate commerce.

**Griffith, J.**, concurs in the foregoing dissent.