INTERSTATE OIL PIPE LINE CO. *v.* STONE, CHAIRMAN OF STATE TAX COMMISSION.

(In Banc. April 26, 1948. Suggestions of Error Overruled June 14, 1948.)

[35 So. (2d) 73. No. 36672.]

716

June 14, 1948.)

[36 So. (2d) 142. No. 36672.]

Alexander, Alexander & Chill and **Walter D. Davis,** all of Jackson, and **F. R. Clark, Jr., J. L. Seger,** and **P. H. Hunter,** all of Tulsa, Okla., for appellant.

720

J. H. Sumrall, of Jackson, for appellee.

Argued orally by **P. H. Hunter**, and **Jas. A. Alexander, Sr.**, for appellant and by **J. H. Sumrall**, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This is a suit wherein the appellant Interstate Oil Pipe Line Company seeks a refund of taxes in the sum of $25,326.63 which it paid on March 24, 1947, to the appellee A. H. Stone, Chairman of the State Tax Commis-

sion, for the period from January 1, 1944, to June 30, 1946, inclusive.

During the period aforesaid the appellant, a Deleware corporation which had qualified to do business in this State, owned and operated several pipe line systems for gathering crude oil from tanks on producing leases in numerous oil fields in Mississippi and transporting the same to some local shipping point on a nearby railroad where the same was in each instance transported in due time by the railroad company to an out of state destination.

The pipe lines systems, respectively consisted of pipes extending from a central or main line so as to connect with the oil tanks located on producing leases in the vicinity of the wells and thence to the loading racks or stations of the pipe line company adjacent to the railroad. At the oil tanks near the producing wells there were pumps installed by said company with which it pumped the oil from the tanks into its pipe line and then to the railroad, where it again pumped the same from its loading racks or tanks into the railroad tank cars as soon as such cars were ''spotted'' for that purpose.

The pipe line company made one charge of a few cents per barrel for pumping the oil from the lease tanks at the oil fields into its pipe line and thence to the railroad shipping point, the amount received for such service depending upon the distance to the railroad from each oil field, and then a separate and additional charge of two cents per barrel for pumping the same from its loading racks or tanks, into the railroad tank cars. Of course, it received no part of the charges collected by the railroad company for transporting the oil across the state line to its destinations. In fact, it had no contractual relation with the railroad company in connection with the latter's said interstate transportation of such oil.

The privilege tax for operating these pipe line systems for transporting the oil from one point to another in this

State as well as the use tax on the use of the tangible personal property used in connection therewith were collected pursuant to assessments made after proper notices given and hearings had thereon in compliance with due process of law. The liability therefor is contested by the pipe line company on two grounds: (1) It contends that Sections 10105 and 10109, Code 1942, under which $20,296.63 of the amount involved was paid as a privilege tax for operating the pipe lines for transporting crude oil from one point to another in this State, and also Sections 10148 and 10149, Code 1942, under which the remaining $5,030.27 was paid as a use tax on its tangible personal property used in the operation of the pipe lines, contain express exemptions against liability therefor under the admitted facts of the case; and (2) that the taxpayer's transportation of the oil was in interstate commerce, and that, therefore, the imposition of both of the taxes here in question violates the commerce clause of the Constitution of the United States, Article I, Section VIII, Cause 3 thereof, without regard to the alleged statutory exemption claimed in each instance.

The case was heard in the Circuit Court upon the pleadings and an agreed statement of the facts as to the method aforesaid whereby the business of the taxpayer was conducted in this State, and also as to the circumstances hereinafter mentioned under which it procured and brought into this State the tangible personal property used in the construction and operation of its pipe lines; and with the result that the trial court denied liability for the refund of all the taxes in question.

We are of the opinion that the Court was correct in disallowing a refund of the tax in the sum of $20,296.63, which had been collected for the privilege of operating the pumping machinery and other pipe line equipment in the transportation of oil in the manner hereinbefore set forth, but that the Court was in error in disallowing a refund of the use tax of $5,030.27, for reasons hereinafter stated.

We shall discuss the question of liability for these taxes respectively in reverse order. Section 10148, Code 1942, assesses and levies "a tax or excise for the privilege of use, . . . of any article of tangible personal property" in this State, equal to 2% of the purchase price thereof; and Section 10149, Code 1942, provides that "the tax levied by this act shall not be collected in the following instances: . . . (d) On the use . . . of tangible personal property used . . . in the furtherance of interstate transportation or interstate commerce, or on the use, . . . of any property . . . , which is not procurable in the ordinary channels of trade in the state of Mississippi." And Section 10146, Code 1942, relating to this Use tax, recites, among other things, that "the primary purpose of which (the statute) is hereby declared to be the imposition of a tax for the privilege of using, . . . tangible personal property; . . . , and to protect, insofar as may be proved practicable, the merchants, dealers, manufacturers and persons engaged in businesses of rendering services in Mississippi, who operate under the privilege tax laws of this state, who pay the taxes imposed thereby, and who meet the requirements of the Mississippi sales tax laws, against the unfair competition of importation of goods and services into Mississippi without the payment of the retail sales tax imposed for the sale of goods, wares and merchandise usually carried for sale in this state, . . . "

It is agreed that $4,362.75 of the $5,030.27 was paid for the privilege of using tangible personal property in the construction and operation of the pipe line gathering systems hereinbefore mentioned, and that the remaining $667.52 was paid for the privilege of using certain copper wire, glass insulators, fittings, hardware, brackets, lamps, screws, and other supplies in constructing a telephone system adjacent to *an interstate trunk pipe line* right-of-way separate and apart from the oil gathering pipe line systems hereinbefore mentioned, and that the same was necessary to and used solely in connection with the *dis-*

*patching and movement of interstate shipments* and the servicing and maintenance of its said *interstate trunk line system.*

It is further agreed that the total amount of the said Use tax was computed and paid upon the purchase price of material brought from without the State by the pipe line company "and that none of said property was available for purchase from stock piles in the State, but that all such materials were procurable from sales agents then operating in the State, who might have forwarded orders to suppliers located outside the State for shipment by said suppliers to appellant in Mississippi"; and from this factual situation we are asked to determine the question of whether or not such property was "procurable in the ordinary channels of trade in the State of Mississippi," and also whether or not the same was used "in the furtherance of interstate transportation or interstate commerce" by the pipe line company.

We do not think that the fact that such materials were procurable through sales agents then operating in the State who could have forwarded orders to outside manufacturers or dealers meant that such materials were "procurable in the ordinary channels of trade in the State of Mississippi." If merchants, dealers, manufacturers and others engaged in businesses in this State could not supply the demand for this material, then there could be no "unfair competition" with them by non-residents engaged in manufacturing and selling the same, since the taxpayer had to resort to placing orders through such sales agents in the State to procure the materials from manufacturers or dealers outside thereof. We are therefore of the opinion that under Section 10149 there could be no liability in the instant case for the use tax whether the property was used "in the furtherance of interstate transportation or interstate commerce" or not, since the statute by its very language provides that the tax shall not be collected *either* on the use of tangible personal property used "in the furtherance of interstate transpor-

tation or interstate commerce'' *or* on the use of such property ''which is not procurable in the ordinary channels of trade in the State of Mississippi.''

Except for the agreed statement of facts to the contrary, we would naturally assume that the enumerated articles for the use of which the said $667.52 was paid were procurable in the ordinary channels of trade in the State of Mississippi. However, that fact becomes immaterial here for the reason that it is further agreed, as hereinbefore shown, that such supplies were used in connection with the operation of *an interstate trunk pipe line* of the appellant taxpayer whereby it transported oil from the tanks on producing leases on its ultimate and final passage from this State into other states in interstate commerce, such trunk line being operated entirely separate and apart from the oil gathering systems involved herein for transporting oil from one point to another in this State.

And referring further to the remaining $4,362.75 of the Use tax which was paid for the privilege of using the tangible personal property in the construction and operation of the oil pipe line gathering systems for transporting oil from one point to another in this State, it should be noted that aside from the fact that said property was ''not procurable in the ordinary channels of trade in the State of Mississippi'' the same was *at least* used ''in the furtherance of interstate transportation or interstate commerce'' in which the railroad companies were engaged when transporting the oil on its ultimate journey from the local shipping points and cross the State line to its out-of-state destinations.

And now passing to the exemption claimed for the privilege taxes of $20,296 36 levied and collected for operating the pipe lines for transporting the oil from one point to another in this State, we find that Section 10105, Code 1942, levies annual privilege taxes, measured by the amount or volume of business done, on the basis of 2% of the gross income therefrom, or gross proceeds of sales, as the case may be, as follows: (1) Upon every person en-

gaging or continuing within this State in the business of mining, etc., levied by Section 10106, of said Code; and (2) on every person engaging or continuing within this State in the business of manufacturing, etc., levied by Section 10107, of said Code; (3) on every person engaging or continuing in this State in the business of selling any tangible property whatsoever, real or personal (not including, however, bonds or other evidence of indebtedness, or stocks), levied by Section 10108 of said Code; and (4) upon every person engaged or continuing within this State in the business of operating certain other public utilities, including those "operating a pipe line for transporting from one point to another in this State oil . . . through pipes or conduits in this State," levied by Section 10109 of said Code.

In the latter Section, which is now under consideration, there is included a tax on those operating numerous other public utilities insofar as the business done by them from one point to another in this State is concerned, the tax in each instance being measured by 2% of the gross income of such intrastate business. They too have paid ad valorem, franchise and other taxes paid by this pipe line company in addition to the privilege tax levied by the statute here involved.

And Section 10109, supra, expressly excepts from the gross income of all these public utilities, used in determining the measure of the tax, so much thereof as is derived from commerce between this and other States, "which the State of Mississippi is prohibited from taxing under the Constitution of the United States of America."

By the above exception the Legislature seems to have recognized that many of the utilities enumerated in said Section of the Code engaged in both intrastate and interstate commerce, that all activity in the State having a relation to interstate commerce is not exempt from bearing its share of local taxation by the commerce clause of the Federal Constitution, and by thus excepting from

the gross income used in determining the measure of the tax so much thereof as is derived from business conducted in commerce between this and other States "which the State of Mississippi is prohibited from taxing under the Constitution of the United States of America" it was made known that it was not the purpose of the Legislature to attempt to burden interstate commerce *as such* by the levy of a tax measured by a per cent of the gross income derived therefrom.

It is the uniform rule laid down by all of the Courts that tax exemption statutes should be strictly construed and that when any doubt arises as to whether or not an exemption is granted by such statute the doubt must be resolved against the exemption. The citation of authorities in support of this principle is deemed unnecessary.

It is to be conceded, however, that in considering the privilege tax imposed by Sections 10105 and 10109, supra, here in question, which as a matter of convenience and best available means of fixing the amount thereof is to be measured by a per cent of the gross income of the business done by the taxpayer, any reasonable doubt as to whether or not the business done by the taxpayer can be detached in its main and essential feature as a local activity must be resolved in favor of the taxpayer in connection with the said requirement that when the taxpayer is relying upon an exemption the claim of non-liability is to be clearly sustained under the proven facts in the light of the burden of proof resting upon the taxpayer to establish that the case comes within such exemption.

If the exemption was intended to apply under the facts of the instant case, then the levy of the tax on the privilege of operating a pipe line for the transportation of oil from one point to another in the State could have served no useful purpose, since it was known that all of the oil transported by pipe line from producing leases or elsewhere would be transported to destinations outside the State either by interstate trunk pipe lines, on a continuous journey, or likewise by railroad from local shipping

points within the State. If by the former method, it would of course constitute that character of commerce "which the State of Mississippi is prohibited from taxing under the Constitution of the United States," and this would be equally true as to the movement by rail of oil from a local shipping point to its destination outside the State in crossing the state line. Hence, the statute was designed only for the purpose of taxing the privilege of operating a pipe line for transporting the oil from one point to another in the State where it is then delivered to an interstate carrier prior to the beginning of its ultimate passage to a foreign state in interstate commerce. Most assuredly, no pipe line company would be deemed justified in installing an oil gathering system to transport oil other than that destined for ultimate interstate shipment, there being no oil refineries here.

During the period for which these taxes were collected, the taxpayer as heretofore stated was transporting some oil from within the State to outside destinations by an interstate trunk pipe line, and subsequent to the expiration of the said two and a half year period in question it has transported practically all of the oil handled by it for the owners and shippers thereof by means of oil trunk pipe lines to out of state destinations, and for which particular activity no tax has ever been demanded or collected. The entire tax collected, and for which a recovery is sought herein was measured by a per cent of gross receipts of the business done in transporting oil from one point to another in this State through its local oil gathering systems and for loading the same into railroad tank cars as hereinbefore described. Therefore, it appears that insofar as its own activities in that regard and the services of its employees in this State in that behalf were concerned, this pipe line company was an intrastate carrier. It transported no oil across the State line in the operation of such local pipe lines, that is to say, the essential and controlling feature of its business from which the tax in question was collected was the transportation of

oil from one point to another in intrastate commerce. It was not employed or hired to transport oil to any destination outside the state, but only to transport the same to the railroad and then pump it into the railroad tank cars as a local activity, insofar as the right of taxation of its privilege of operating the intrastate pipe line is concerned.

It is agreed that the said taxpayer received the oil at the leased tanks at or near the place of production under a "tender of shipment" from the owner, supplied by the taxpayer, which showed the consignee and ultimate destination thereof to be outside the State, etc., and it thereafter obtained for such owner from the railroad company a bill of lading at the time the same was delivered to such interstate railroad carrier. But "it is not within the power of the parties by the form of their contract to convert what is exclusively a local business, subject to state control, into an interstate business, protected by the commerce clause." 11 Am. Jur., p. 29. And to the same effect is the rule announced in 15 C. J. S. Commerce, Sec. 17, page 278. In other words, neither the form of contract nor method of billing is controlling on the question of whether the pipe line company was employed to do more than render a local service for the owner of the oil by pumping the same out of the lease tanks and through its pipe line to where it could be later pumped and loaded by said company into the railroad tank cars to be started on its ultimate interstate passage.

In 51 Am. Jur., Section 205, page 266, it is said: "It is generally held that a movement merely in preparation for export—in other words, a mere transfer of the property to a depot or other place within a state from which the transportation or journey to another state is to begin at a convenient time—is not a part of that transportation, so as to exempt the property because of such transfer movement from state taxation upon the ground of the interference or burden upon interstate commerce." Numerous authorities are cited to support this announce-

ment, including the case of Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 479, 29 L. Ed. 715, wherein the Court said: "But this movement (in interstate commerce) does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot *where the journey is to commence,* is no part of that journey . . . Until actually launched on its way to another state, or committed to a common carrier for transportation *to such state,* its destination is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state. Carrying it from the farm or the forest to the depot is only an interior movement of the property, entirely within the state, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation. It is no part of the exportation itself. Until shipped or started on its final journey out of the state its exportation is a matter altogether in fieri, and not at all a fixed and certain thing." (Italics ours.) Here the oil was not committed by the owner to this pipe line company for transportation to another state, but to be transported to the railroad and there loaded into tank cars.

In the instant case, the owner of the oil could have directed the pipe line company as its agent to divert the proposed shipment from its intended out-of-state destination and caused it to be shipped to the Gulf Coast of the state, to be sold there, or so as to otherwise prevent its interstate transportation, and to obtain a bill of lading to that end, instead of procuring for the owner a bill of lading to the originally contemplated out-of-state destination, and this could have been done without working a breach of the tender of shipment under which the pipe line company had received the oil, since the interest of the said pipe line company, unlike that of the railroad company, could not be affected one way or the other by the diverting of the shipment, for the reason that the pipe

line company was to receive no part of the charges to accrue after the oil was loaded into railroad tank cars for its final destination.

The said tender of shipment provided, among other things, that the "crude petroleum accepted for gathering and transporting shall be subject to a lien for all such (tariff) charges (for transporting the oil to the railroad and loading the same) and said lien shall attach to any crude petroleum not yet delivered to destination for all unpaid charges arising hereunder on the crude petroleum covered by the same tender."

It is to be conceded that the lien above mentioned, as well as the local activities of this taxpayer in the operation of its pipe line for transporting oil from one point to another in this State, together with its tangible personal property employed in the operation of said business, enjoys the protection of the state laws. Also, that the particular tax here under consideration is not a tax on a commodity in transit. Nor is it a direct tax upon such gross receipts. It is a tax on the local business of operating the pipe line, and as heretofore stated the amount thereof is measured by 2% of the gross receipts derived therefrom, as a matter of convenience. That is to say, it is merely a tax on the privilege of engaging in a local activity insofar as this taxpayer was concerned. Moreover, it is not measured by a per cent of the entire gross income received from the transportation of the oil from the tanks on the producing leases to its out of state destination, since the gross income received by the railroad company for transporting the oil on its ultimate journey beyond the State in interstate commerce is no part of the measure of the tax.

It may be also conceded for the purpose of this decision, but without admitting that the pipe line company is engaged in interstate commerce, that there is no appreciable interruption at the railroad shipping point in the continuity of the transportation of the oil from the tanks on the producing oil leases to its out of state des-

tinations, though it is pumped from said tanks to the railroad under a tender of shipment, furnished to the owner by the pipe line company, to where it reaches the loading racks or stations on the railroad and is thence later, as soon as cars arrive, shipped by rail out of the State under a bill of lading obtained from the railroad company by the pipe line company as agent of the owner of such oil.

In the case of Stone v. Memphis Natural Gas Co., 201 Miss. 670, 29 So. (2d) 268, 269, this Court upheld "a franchise or excise tax" levied and assessed by Section 9314, Code 1942, against the said gas company, a Delaware corporation which had not even qualified to do business in this State, and where the stipulation of facts stated that the said "appellee company is not, and has not been, engaged in any intrastate commerce in Mississippi, but that its business, so far as concerns this State, has been interstate solely and exclusively; that it has only one customer in the State, and to this customer it delivers gas wholesale, under a contract made in another state."

The said gas company then owned and operated a natural gas pipe line running from the Monroe gas field in Louisiana to Memphis, Tennessee, and beyond, entering Mississippi south of Greenville and extending for a distance of approximately 135 miles through this State, along which line it maintained two compressing stations in this State. The contention made in that case was that no tax of any kind could be levied by the State of Mississippi against the pipe line company other than the ad valorem taxes which it had already paid, and that any other tax, and particularly a franchise tax, would be to tax interstate commerce.

While the tax upheld in that case was a franchise tax as distinguished from the privilege tax involved in the case at bar, it was nevertheless a tax on the right and privilege of exercising its corporate powers and enjoying the protection of the state laws in the use and mainte-

nance of its property for the conduct of its business, and we are of the opinion that what was said by the court in sustaining the tax was in keeping with the modern trend of the decisions of the Supreme Court of the United States upon the right of a State to require one whose property and business enjoys the protection of local laws to bear its proper share of the expense of the State government, where the tax is non-discriminatory and does not constitute a *direct* burden on interstate commerce; and of which modern trend we have ample evidence in what was said in the case of McGoldrick v. Berwind-White Coal Mining Co., 309 U. S. 33, 60 S. Ct. 388, 84 L. Ed. 565, 128 A. L. R. 876, even though the factual situation in that case was likewise different to that involved in the case at bar.

In this connection we said in the case of Stone v. Memphis Natural Gas Co., supra:

"It is to be seen that there is no attempt to tax interstate commerce as such, but the levy is an exaction which the State requires as a recompense for its protection of lawful activities carried on in this State by the corporation, foreign or domestic, activities which are incidental to the powers and privileges possessed by it by the nature of its organization—here the local activities in maintaining, keeping in repair, and otherwise in manning the facilities of the system throughout the 135 miles of its line in this State." We then cited Interstate Natural Gas Co. v. Stone, 308 U. S. 522, 60 S. Ct. 292, 84 L. Ed. 442; Stone v. General Contract Purchase Corp., 193 Miss. 301, 312, 7 So. (2d) 806, 140 A. L. R. 1029; and Stone v. General Electric Contracts Corp., 193 Miss. 317, 7 So. (2d) 811; and further observed that:

"It has often been observed in times past that interstate commerce should pay its way, should be made to bear a fair share of the cost of local government whose protection it enjoys, but outside of ad valorem taxes and until recently most efforts to make it pay its way have met with failure. In late years, however, there is a tend-

ency to uphold local taxation when it does not bear directly upon interstate commerce as commerce, or when indirect, it had no substantial effect to block or impede the free flow of such commerce.

"And more recently there has been a pronounced trend that, in order to make a more reasonable accommodation between local needs and the dominant requirement of freedom in the national commerce, recognition shall be givn to a rule as follows: That although a particular activity may be essential to the continued full and unimpeded flow of commerce between the states as regards a particular commodity or other matter of such commerce, yet if that activity is of a substantial character, and is one which actually and distinctly happens in the particular State and must be, and is, protected by that State regardless of the ultimate purpose of the activities, then for the purpose of laying a tax as a recompense for the local protection afforded, the State may detach the activity so long as the exaction on account of it is not made a pretext to impose a burden which would have the effect, beyond that which is remote or unsubstantial, to interfere with the national interests."

The fact that the imposition of a state tax adds to the cost of interstate commerce is not alone sufficient to invalidate the tax as an interference with that commerce. 51 Am. Jur., Sections 203, 207, pp. 264, 270, citing McGoldrick v. Berwind-White Coal Mining Co., supra, and other cases, among which is the case of Coverdale v. Arkansas-Louisiana Pipe Line Co., 303 U. S. 604, 58 S. Ct. 736, 82 L. Ed. 1043.

In the case of Dunston v. City of Norfolk, 177 Va. 689, 15 S. E. (2d) 86, 88, the Court said:

"Finally, the Supreme Court of the United States has declined to deny to the States the right to levy a tax upon interstate commerce merely because it is such commerce. The latest cases recognize and admit the right of the States to require such commerce to bear its fair share of the cost of local government, notwithstanding the fact

that the exercise of such right may, in some measure, affect the commerce or increase the cost of doing business. They declare that the purpose of the commerce clause is to allow interstate commerce to compete on a fair and equal basis with local commerce. . . .

"The change of interpretation thus evidenced was more fully enlarged and amplified, in 1940, in the three cases of McGoldrick v. Berwind-White Coal Mining Company, 309 U. S. 33, 60 S. Ct. 388, 84 L. Ed. 565, 128 A. L. R. 876; and McGoldrick v. Felt & Tarrant Manufacturing Company and McGoldrick v. A. H. Du Grenier, Inc., 309 U. S. 70, 60 S. Ct. 404, 84 L. Ed. 584, sometimes referred to as the New York City Sales Tax Cases."

The general rule is announced in 51 Am. Jur., Sec. 204, p. 264, that "the commerce clause of the Federal Constitution affords immunity to property from local taxation when, but only when, it is in transit as interstate or foreign commerce," citing Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195, and numerous other cases. But here the tax is not on any property in transit as interstate commerce or otherwise, but is merely on the privilege of operating a pipe line wholly within this State as a local activity. It is not on the owner or shipper of the oil. Nor is it a direct tax on the gross receipts from either the activity of the pipe line company or the interstate transportation by the railroad company, but rather a tax on the privilege of doing an intrastate business, and measured by a per cent of gross income as a matter of convenience. It only indirectly affects the commerce.

Moreover, the tax would be equally applicable to a domestic or foreign corporation engaged in such activity or in transporting oil by pipe line from tanks on producing leases to an oil refinery, should there be one in the State, whether the oil was ultimately transported in interstate commerce or not, and therefore the taxing statute in no manner discriminates against interstate com-

merce, and it only incidentally and indirectly affects the same.

In McGoldrick v. Berwind-White Coal Mining Co., supra [309 U. S. 33, 60 S. Ct. 391], the Court said: "Forms of state taxation whose tendency is to prohibit the commerce or place it at a disadvantage as compared or in competition with intrastate commerce and any state tax which discriminates against the commerce, are familiar examples of the exercise of state taxing power in an unconstitutional manner, because of its obvious regulatory effect upon commerce between the states. But it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business . . . Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless falls far short of the regulation of the commerce which the Constitution leaves to Congress."

We quoted the above language with approval in Stone v. General Electric Contracts Corp., 193 Miss. 317, 7 So. (2d) 811, 815. In that case we also cited State of Wisconsin v. J. C. Penney Co., 311 U. S. 435, 61 S. Ct. 246, 85 L. Ed. 267, 130 A. L. R. 1229, wherein it was said: "A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society."

We are of the opinion that the case of Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. Ed. 626, and other similar cases such as those reviewed in the annotation contained in 171 A. L. R. at page 283 et seq., and

some of which are relied upon by the appellant, are to be distinguished from the instant case in that they involve only the question of whether or not a property tax —for ad valorem purposes—could be imposed upon a commodity which is temporarily interrupted in transit for a change in the mode of transportation and where the same does not remain in the taxing state long enough to acquire a situs therein for ad valorem taxation purposes. They do not involve the right of the State to exact a tax upon the *privilege of engaging in the local activity* of rendering services wholly within the taxing state for hire, such as operating pumping machinery and pipe lines for the transportation of commodities from one point to another in the State.

Moreover, in the Carson Petroleum Company case, supra, the oil was purchased outside of Louisiana, shipped into that state to a storage place and was awaiting the arrival of ships for its transportation to foreign countries. There was no question about the property being in transportation in interstate commerce and the ad valorem tax sought to be assessed was against the owner of the oil where the same remained at the storage place only long enough for a change in the mode of transportation, and for an insufficient time to acquire a situs in Louisiana for ad valorem taxation purposes.

The Court decisions, state and federal, cited both on behalf of the taxpayer and the Tax Commission, are too numerous for discussion and analysis in an·opinion of justifiable length, but we think that when each of them is viewed in the light of their particular facts it will be found that the more recent cases sustain the view that the commerce clause of the Federal Constitution does not deny to the State the right to tax the privilege of engaging in a local activity such as is here involved.

The decision of the trial court will, therefore, be affirmed wherein it upheld the tax collected for operating the pipe lines in question and reversed wherein it upheld

the Use tax on the use of the property employed in the operation of said pipe line business, and a judgment here will be entered accordingly.

Affirmed in part, reversed in part and judgment accordingly.

**Alexander, J.**, took no part in this decision.

PARTIALLY DISSENTING OPINION.

**Griffith, J.**, delivered a partially dissenting opinion.

Under the precise facts as disclosed by this record I am of the opinion that all the activities here in question were interstate in character and that none of the tax here sought to be imposed could be lawfully collected. The authorities which support that view will appear in the reporter's abstracts and will not be further referred to here.

**L. A. Smith, Sr., J.**, concurs in this dissent.

ON SUGGESTION OF ERROR.

**Roberds, J.**, delivered the opinion of the court on suggestion of error.

Each party to this appeal has filed a Suggestion of Error.

Appellant contends we were in error in affirming the lower court in its disallowance to appellant of a refund of $20,296.36 collected by the Chairman of the State Tax Commission for appellant's privilege in operating pipe lines in Mississippi through which it transported oil from one point to another in this State. Sections 10105 and 10109, Code 1942. We have re-examined the questions, but find no reasons impelling a change in, or reversal of, that opinion.

Appellee suggests that we erred in allowing to appellant a refund of Use Taxes amounting to $5,030.27. That

740

holding was based, first, on the ground that the property operated by appellant in transporting oil was used ". . . in the furtherance of interstate transportation or interstate commerce . . ."; and second, on the further ground that such property was ". . . not procurable in the ordinary channels of trade in the State of Mississippi", both of which exceptions are set out in Section 10149, Code 1942. The facts underlying the second ground were not fully developed in the record, but we thought enough appeared to justify our holding in the absence of citation of any authority to the contrary. However, the Suggestion of Error has called to our attention the cases of Peoples' Gas & Electric Company v. State Tax Commission of Iowa, Iowa, 28 N. W. (2d) 799, and General Trading Company v. State Tax Commission of Iowa, 322 U. S. 335, 64 S. Ct. 1028, 88 L. Ed. 1309, apparently holding otherwise. A decision on this point was not necessary to the result reached by us; it was sufficient that the property was being used in furtherance of interstate transportation or commerce. We, therefore, withdraw all that was said in the original opinion in Paragraphs Eleven, Twelve and Thirteen thereof, and we let non-liability for the Use Tax rest solely on the stated ground that the property was being used in furtherance of interstate transportation or interstate commerce.

Both suggestions of error are overruled.