## INTERSTATE OIL PIPE LINE CO. *v.* STONE, CHAIRMAN STATE TAX COMMISSION.

No. 287. Argued January 13, 1949.—Decided June 20, 1949.

*Phelan H. Hunter* argued the cause for appellant. With him on the brief were *Villard Martin* and *Garrett Logan.*

*J. H. Sumrall* argued the cause and filed a brief for appellee.

Mr. Justice Rutledge announced the judgment of the Court and the following opinion, in which Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Murphy join.

This appeal questions the power of Mississippi, as affected by the commerce clause, to impose a tax measured by gross receipts from the operation of a pipe line wholly within the state.

Appellant is a Delaware corporation which has qualified to do business in Mississippi as a foreign corporation. It owns and operates pipe lines which are used to transport oil from lease tanks in various oil fields in Mississippi to loading racks adjacent to railroads elsewhere in the state.[1] From these racks the oil is pumped into railroad tank cars for shipment outside the state. If there are no tank cars available the oil is stored in tanks near the racks. But such delays in loading are usually of short duration and never exceed a week, according to appellant's uncontradicted statement. When delivered to appellant the oil is accompanied by shipping orders from the producer or owner directing that the oil be transported to out-of-state destinations. There are no refineries in Mississippi. There is no through bill of lading from the point of origin at the fields to the destination outside the state. Appellant ships the oil by rail as agent of the owner on bills of lading showing the owner as shipper,

---

[1] Appellant also gathers oil which is transported through the Mississippi pipe lines directly into interstate trunk lines, through which the oil is carried outside the state. Mississippi has not attempted to tax the receipts attributable to shipments of this kind.

the appellant as agent of the shipper, and indicating the destination specified in the shipping orders issued to appellant. Appellant is paid by the producer at the rate per barrel specified in its tariff [2] for transporting the oil from the gathering point to the rack, and is paid an additional charge for loading the oil in the tank cars.

The chairman of the Mississippi State Tax Commission, appellee, levied a tax against appellant for the years 1944, 1945 and the first half of 1946, in the sum of $20,296.36, measured by appellant's receipts for transporting oil from the lease tanks to the railroad loading platforms, pursuant to the following sections of the Mississippi Code, Miss. Code, 1942, Ann., tit. 40, c. 3, § 10105, and § 10109 (1948 Cum. Supp.), which provide:

"10105. . . . There is hereby levied and shall be collected annual privilege taxes, measured by the amount or volume of business done, against the persons, on account of the business activities, and in the amounts to be determined by the application of rates against values, or gross income, or gross proceeds of sales, as the case may be, as follows [see sections following]:"

"10109. . . . Upon every person engaging or continuing within this state in the business of operating a pipe line for transporting for compensation or hire from one point to another in this state oil or natural gas or artificial gas through pipes or conduits in this state, there is likewise hereby levied and shall be collected a tax, on account of the business engaged in, equal to two per cent of the gross income of the business.

---

[2] All appellant's transportation of oil in Mississippi is covered by tariffs which are published and filed with the Interstate Commerce Commission as required by the Interstate Commerce Act, as amended, 49 U. S. C. §§ 1 (1), 1 (3), and 6.

"There shall be excepted from the gross income used in determining the measure of the tax imposed in this section so much thereof as is derived from the business conducted in commerce between this state and other states of the United States, or between this state and foreign countries which the state of Mississippi is prohibited from taxing under the constitution of the United States of America. . . ." [3]

The State Tax Commission sustained the assessment. The trial court dismissed a declaration seeking review of the Commission's action. The Supreme Court of Mississippi affirmed that judgment, overruling appellant's contention that because the tax was levied on the privilege of conducting an interstate business and measured by gross receipts therefrom the tax could not be imposed without offending the commerce clause of the Federal Constitution. 203 Miss. 715, 35 So. 2d 73.

The state supreme court held that the operation of these pipe lines between points within the state was intrastate rather than interstate commerce, and that the tax was therefore "merely on the privilege of operating a pipe line wholly within this State as a local activity. . . . a tax on the privilege of doing an intrastate business, and measured by a percent of gross income as a matter of convenience." 203 Miss. at 732, 35 So. 2d at 81.

Appellant contends that operation of the pipe lines between points in Mississippi was in fact interstate commerce, and that the tax was construed by the Supreme Court of Mississippi to be a tax on the privilege of oper-

---

[3] Other provisions of the Mississippi Code not here involved impose franchise, net income and *ad valorem* property taxes, all of which appellant paid for the years involved. This fact does not of course preclude Mississippi from exacting a different tax for the protection upon which one or more of these taxes is based. E. g., *Memphis Gas Co.* v. *Stone*, 335 U. S. 80, 85.

ating the pipe lines. From these premises, together with the major premise that no state can tax the privilege of engaging in interstate commerce, appellant concludes that the tax may not constitutionally be imposed.

We do not pause to consider whether the business of operating the intrastate pipe lines is interstate commerce, for, even if we assume that it is, Mississippi has power to impose the tax involved in this case. Further, we do not find it necessary to dispute that the Supreme Court of Mississippi construed the statute as imposing a tax on the privilege of operating a pipe line wholly within the state, and not a tax solely upon the "local activities of 'maintaining, keeping in repair, and otherwise in manning the facilities' " situated in Mississippi, *Memphis Gas Co.* v. *Stone,* 335 U. S. 80, 92–93, or upon the gross receipts themselves, *Central Greyhound Lines* v. *Mealey,* 334 U. S. 653. While we are of course bound by the construction given a state statute by the highest court of the State,[4] we are concerned with the practical operation of challenged state tax statutes, not with their descriptive labels.[5]

The statute is not invalidated by the commerce clause of the Federal Constitution merely because, unlike the statute attacked in *Memphis Gas Co.* v. *Stone, supra,* it imposes a "direct" tax on the "privilege" of engaging in interstate commerce.[6] Any notions to the contrary should not have survived *Maine* v. *Grand Trunk R. Co.,* 142 U. S. 217, which flatly rules the case at bar. That case sustained a state statute which imposed upon an interstate railroad corporation "an annual excise tax

---

[4] *Minnesota* v. *Probate Court,* 309 U. S. 270, 273; *Guaranty Trust Co.* v. *Blodgett,* 287 U. S. 509, 513.

[5] *International Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340, 346, 347; *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359, 363.

[6] See concurring opinion in *Freeman* v. *Hewit,* 329 U. S. 249, 259.

[measured by apportioned gross receipts], for the privilege of exercising its franchises in this State."[7]  The *Grand Trunk* decision has been approved by this Court as recently as the other controlling case of *Central Greyhound Lines* v. *Mealey, supra* at 658, 663, in which the Court permitted New York to impose a tax on the gross receipts from the operation of an interstate bus line, provided that tax was apportioned according to mileage traveled within the state.  The *Mealey* case is not distinguished by saying that it involved only a tax on gross receipts and not a tax on interstate commerce itself, for gross receipts taxes have long been regarded as "direct" in cases which are supposed to support the proposition that "direct" taxes on interstate commerce are invalid under the commerce clause.[8]

Since all the activities upon which the tax is imposed are carried on in Mississippi, there is no due process ob-

---

[7] Nothing in the *Grand Trunk* opinion suggests the explanation hazarded by Mr. Justice Holmes in *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217, 226, that the tax in the *Grand Trunk* case was sustained on the ground that it was imposed in lieu of *ad valorem* taxes.  A copy of the statute reprinted in the margin of the Reports discloses that the tax was "in lieu of all taxes upon such railroad, its property and stock," except that cities and towns were permitted to tax not only all buildings owned by the railroad but also railroad-owned "lands and fixtures" outside the right of way.  142 U. S. 217–218, n. 1.

[8] See the cases discussed in *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 255–257; concurring opinion in *Freeman* v. *Hewit,* 329 U. S. 249, 264–266.  As the cited discussions point out, most of the cases invalidating "direct" taxes on interstate commerce are explicable on the ground that the taxes were not fairly apportioned. But cf. the following cases, which involve apportioned franchise or privilege taxes measured by a standard other than gross receipts: *Ozark Pipe Line Corp.* v. *Monier,* 266 U. S. 555; *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203; cf. *Anglo-Chilean Nitrate Sales Corp.* v. *Alabama,* 288 U. S. 218.

jection to the tax.[9]  The tax does not discriminate against interstate commerce in favor of competing intrastate commerce of like character.[10]  The nature of the subject of taxation makes apportionment unnecessary; there is no attempt to tax interstate activity carried on outside Mississippi's borders.  No other state can repeat the tax.[11] For these reasons the commerce clause does not invalidate this tax.

The judgment is

*Affirmed.*

MR. JUSTICE BURTON, concurring.

I join in the judgment of affirmance announced by the Court but do not join in the opinion rendered in support of it.

I concur in the judgment solely on the ground that the tax imposed by the State of Mississippi was a tax on the privilege of operating a pipe line for transporting oil in Mississippi in intrastate commerce and that, as such, it was a valid tax.  The Supreme Court of Mississippi, in the case below, 203 Miss. 715, 35 So. 2d 73, held that this tax had been authorized by a statute of that State, Miss. Code Ann. §§ 10105, 10109 (1942), and, for the reasons stated by that court, I believe that neither the statute nor the application of the tax in the present instance violated the Constitution of the United States.

---

[9] *Nippert* v. *Richmond,* 327 U. S. 416, 423–424; *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444–445; separate opinion in *International Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340, 352–353; concurring opinion in *Freeman* v. *Hewit,* 329 U. S. 249, 271; concurring opinion in *Memphis Gas Co.* v. *Stone,* 335 U. S. 80, 96.

[10] *Best & Co.* v. *Maxwell,* 311 U. S. 454; *Hale* v. *Bimco Trading Co.,* 306 U. S. 375; *Guy* v. *Baltimore,* 100 U. S. 434.

[11] Cf. *Gwin, White & Prince* v. *Henneford,* 305 U. S. 434, 439–440; *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, 311–312; *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 255–257.

On that basis, there is no issue here as to the validity of a tax upon the privilege of transporting oil in Mississippi in interstate commerce.

MR. JUSTICE REED, with whom THE CHIEF JUSTICE, MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON join, dissenting.

Mississippi's effort to collect a privilege tax from this appellant for "operating a pipe line" is upheld by this Court through two separately expressed theories. One, that the activities taxed are wholly intrastate; and the other, that even though the privilege taxed is for the carrying on of wholly interstate operations, such a privilege tax is permissible. As each theory may have effect far beyond this particular case, we think it advisable to state the reasons for our disagreement with both.

The tax which Mississippi demanded, and which appellant is now trying to recover, was computed only upon appellant's receipts as a common carrier for transporting oil from the lease tanks to the railroad loading platforms within the state. The Supreme Court of Mississippi upheld this tax on the ground that the activity producing the receipts was intra- rather than interstate commerce. At one point in its opinion, the Supreme Court of Mississippi said that the tax "had been collected for the privilege of operating the pumping machinery and other pipe line equipment in the transportation of oil in the manner hereinbefore set forth . . . ." *Interstate Oil Pipe Line Co.* v. *Stone,* 203 Miss. 715, 723, 35 So. 2d 73, 75. See an opinion of three members of this Court in *Memphis Natural Gas Co.* v. *Stone,* 335 U. S. 80. The section here in question gives no indication of such a purpose. It thus differs widely from the statute under consideration in the *Memphis* case with its definition of "doing business." See *Stone* v. *Memphis Natural Gas Co.,* 201 Miss. 670, 674–675, 29 So. 2d 268, 270. Since this statute did

not apply to pipe lines reaching across the state line, we conclude that the State Supreme Court did not mean by these words to indicate that the privilege tax of § 10109 for "operating a pipe line" was for the privilege of operating pumping machinery or other equipment as incidents apart from the flow of the interstate commerce. Cf. *Coverdale* v. *Pipe Line Co.*, 303 U. S. 604. Such an interpretation would be inconsistent with the nonliability for the tax of pipe lines, admittedly doing an interstate business. The tax, it said, was "merely on the privilege of operating a pipe line wholly within this State as a local activity. . . . a tax on the privilege of doing an intrastate business, and measured by a percent of gross income as a matter of convenience." 203 Miss. at 732, 35 So. 2d at 81. The opinion emphasizes that in the view of the state court it is the intrastate character of the transportation that makes it permissible to charge the appellant a tax for the privilege of "engaging . . . in the business of operating a pipe line." Miss. Code, 1942, Ann. (1948 Cum. Supp.) § 10109.[1] It considered taxability of the transportation in the light of *Coe* v. *Errol*, 116 U. S. 517, and *Champlain Co.* v. *Brattleboro*, 260 U. S. 366.

*First.* From the facts, §§ 10105 and 10109 of the statute, and the opinion of the Supreme Court of Mississippi, we believe that this statute was determined by the state to impose a privilege tax for carrying on the intrastate business of common carrier of oil in Mississippi and that

---

[1] "Hence, the statute was designed only for the purpose of taxing the privilege of operating a pipe line for transporting the oil from one point to another in the State where it is then delivered to an interstate carrier prior to the beginning of its ultimate passage to a foreign state in interstate commerce. Most assuredly, no pipe line company would be deemed justified in installing an oil gathering system to transport oil other than that destined for ultimate interstate shipment, there being no oil refineries here." 203 Miss. at 729, 35 So. 2d at 77.

the amount of that privilege tax was to be determined by a measure—two percent of the gross income—of that intrastate business. Mississippi's interpretation of the meaning of its statute is binding on this Court.[2]  A federal question at once emerges—whether the shipment of the oil from the gathering point to the railroad loading racks, both points being in Mississippi, is intra- or interstate transportation. This we decide for ourselves from the undisputed facts in this record.[3]  Our first inquiry then must be as to whether the transportation of this oil, wholly within Mississippi from origin to railroad loading racks, is in interstate or intrastate commerce.[4]

In the absence of a rule written into the Constitution or enacted by Congress to determine what transportation is interstate and what intrastate, the courts have been required to determine the character of the transportation, case by case, as it became necessary to reach a judicial conclusion. It was decided years ago in *The Daniel Ball,* 10 Wall. 557, as to navigation on a waterway within a single state, disconnected from any other transportation system leading to or from other states, that the carriage of freight destined for or received from places outside the state of navigation was interstate commerce and made

---

[2] *Southern Gas Corp.* v. *Alabama,* 301 U. S. 148, 153; cf. *Aero Transit Co.* v. *Comm'rs,* 332 U. S. 495, 499. Such determination may be rejected only if a palpable evasion for avoiding a contrary ruling under federal law. *Union Pac. R. Co.* v. *Public Service Comm'n,* 248 U. S. 67; *Appleby* v. *City of New York,* 271 U. S. 364, 379; *Drivers Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 294.

[3] *Southern Gas Corp.* v. *Alabama, supra,* at 154; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 658. See *Caldarola* v. *Eckert,* 332 U. S. 155, 158; *Standard Oil Co.* v. *Johnson,* 316 U. S. 481, 483.

[4] There is no problem as to any differentiation between "in" commerce or "affecting" commerce. Mississippi has decided that the statute applies only to transportation "in" intrastate commerce. 203 Miss. at 715, 35 So. 2d 73. Cf. *Schechter Corp.* v. *United States,* 295 U. S. 495, 542; *McLeod* v. *Threlkeld,* 319 U. S. 491.

the boat subject to regulation by Congress.[5]  The word-
ing of a judicial declaration of the precise line that marks
the change from intrastate movement to interstate move-
ment has been difficult.  In *Coe* v. *Errol,* 116 U. S. 517,
a case that dealt with the taxability by New Hampshire
of logs moved from her forests to a place of shipment in
readiness for out-of-state transportation at the conven-
ience of the owner, this Court held the logs taxable.  The
theory was that the first movement was preliminary to
the interstate transportation,[6] because of the deliberate

[5] "So far as she was employed in transporting goods destined for
other States, or goods brought from without the limits of Michigan
and destined to places within that State, she was engaged in commerce
between the States, and however limited that commerce may have
been, she was, so far as it went, subject to the legislation of Congress.
She was employed as an instrument of that commerce; for whenever
a commodity has begun to move as an article of trade from one
State to another, commerce in that commodity between the States
has commenced.  The fact that several different and independent
agencies are employed in transporting the commodity, some acting
entirely in one State, and some acting through two or more States,
does in no respect affect the character of the transaction."  10 Wall.
at 565.

[6] "What we have already said, however, in relation to the products
of a State intended for exportation to another State will indicate
the view which seems to us the sound one on that subject, namely,
that such goods do not cease to be part of the general mass of
property in the State, subject, as such, to its jurisdiction, and to taxa-
tion in the usual way, until they have been shipped, or entered with
a common carrier for transportation to another State, or have been
started upon such transportation in a continuous route or jour-
ney. . . .  But this movement does not begin until the articles have
been shipped or started for transportation from the one State to the
other.  The carrying of them in carts or other vehicles, or even
floating them, to the depôt where the journey is to commence is
no part of that journey.  That is all preliminary work, performed
for the purpose of putting the property in a state of preparation and
readiness for transportation.  Until actually launched on its way to
another State, or committed to a common carrier' for transportation

detention to await a suitable time for shipment across a state line. *Kelley* v. *Rhoads,* 188 U. S. 1, 6. But where there was no intentional delay, only the use of a "harbor of refuge," the interstate transportation by flotage began when the logs were put into the water. *Champlain Co.* v. *Brattleboro,* 260 U. S. 366.[7] Incidental dealings with the moving commodity do not break the interstate journey.[8] Recently we have considered the effect of "split" means of transportation as to whether the transportation was interstate. *United States* v. *Capital Transit Co.,* 325 U. S. 357, 363. There a traveler went from the District

---

to such State, its destination is not fixed and certain. It may be sold or otherwise disposed of within the State, and never put in course of transportation out of the State. Carrying it from the farm, or the forest, to the depôt, is only an interior movement of the property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the State its exportation is a matter altogether *in fieri,* and not at all a fixed and certain thing." 116 U. S. at 527–28.

[7] "The interstate commerce clause of the Constitution does not give immunity to movable property from local taxation which is not discriminative, unless it is in actual continuous transit in interstate commerce. When it is shipped by a common carrier from one State to another, in the course of such an uninterrupted journey it is clearly immune. The doubt arises when there are interruptions in the journey and when the property in its transportation is under the complete control of the owner during the passage. If the interruptions are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken. . . . In other words, in such cases interstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption during which the tax is sought to be levied." 260 U. S. at 376–77.

[8] *State Tax Comm'n* v. *Gas Co.,* 284 U. S. 41, 43 (reduction of pressure and metering gas).

of Columbia via streetcar or bus to a bus terminal and from there by a different bus to nearby Virginia. We held this to be interstate transportation.[9]

Comment should be made as to several precedents that might be thought contrary to the rather definite line marking the beginning of interstate commerce that appears in the above cases. These are the so-called casual or incidental movements of transportation wholly within a single state immediately preceding or following recognized interstate transportation. They were referred to in *Coe* v. *Errol, supra,* as haulage preliminary to consignment to interstate carriers. This involves the vehicles that carry passengers or freight to or from terminals in their interstate movement.[10] An interstate journey

---

[9] "As previously pointed out, twice a day more than 15,000 government employees traveled between the Virginia agencies and their homes via one of the four bus systems. Most of them either went to or from these bus terminals from or to their homes over any of Transit's then available buses or streetcars. Their travel was at certain hours each day, at which special rush hour buses and cars were made available for their carriage. Their interstate journey to work actually began at the time they boarded a Transit bus or streetcar near their home, and actually ended when they alighted from the Virginia-going bus at their place of work. On returning from work their interstate journey actually began when they boarded a bus near their work and actually ended when they alighted from a Transit streetcar or bus near their home. True, their interstate trip was broken at the District termini of the Virginia buses, when they stepped from one vehicle to another. But in the commonly accepted sense of the transportation concept, their entire trip was interstate. . . . And the fact that, except as to Transit, they paid a combination of two rates, one for travel wholly within the District, and the other for travel between the District and Virginia, and the journey from their residences to Virginia and back again was taken in two segments, does not mean that the total interstate trip was not on a 'through route.'" 325 U. S. at 363.

[10] *Interstate Commerce Comm'n* v. *Detroit, Grand Haven & Milwaukee R. Co.,* 167 U. S. 633; *Pennsylvania R. Co.* v. *Knight,* 192 U. S. 21; *United States* v. *Yellow Cab Co.,* 332 U. S. 218.

must have a beginning and an end. Common sense rejects an extension of the journey to the traveler's front door or the producer's farm or factory when no through order for carriage is in effect. The exact limits of interstate commerce in such fringe situations are uncertain.[11]

We are of the view, however, that the reach of interstate commerce goes to the delivery to Interstate, a common carrier, of the oil by the producer with his tender of shipment. That offer, when accepted, by its form is an order covering the amount of oil, origin and out-of-state destination, and the route and tariff under which shipment is made. The commodity has been placed in the stream of commerce and will cross state lines in the regular course of business. We have held that shipping instructions, given to a freight conductor on a common carrier prior to any movement, put a car into interstate commerce [12] when the instructions were for shipment to an out-of-state destination after a preliminary transit between points in the state of loading. When a shipper delivers his commodity to a common carrier with instructions for billing by such carrier without purposeful delay via another or other common carriers to an out-of-state destination, we think interstate commerce has begun. Such an application of the commerce clause to transporta-

[11] United States v. Yellow Cab Co., supra, at 232–33; Interstate Commerce Comm'n v. Parker, 326 U. S. 60, 71, note 6.

[12] Philadelphia & Reading R. Co. v. Hancock, 253 U. S. 284, 285: "The duties of the deceased never took him out of Pennsylvania; they related solely to transporting coal from the mines. When injured he belonged to a crew operating a train of loaded cars from Locust Gap Colliery to Locust Summit Yard, two miles away. The ultimate destination of some of these cars was outside of Pennsylvania. This appeared from instruction cards or memoranda delivered to the conductor by the shipping clerk at the mine. Each of these referred to a particular car by number and contained certain code letters indicating that such car with its load would move beyond the State."

tion accords with that given to regulation of other phases of interstate commerce.[13] The absence of a through bill of lading is not significant. It is true that the shipment might be diverted to an intrastate destination without crossing a state line but that cannot change the character of the commerce until such diversion order is given. The movement in commerce has begun by the order and the delivery and continues until the commodity is restored to the mass of property within a state by the termination of the transportation. See *Joy Oil Co.* v. *State Tax Commission,* 337 U. S. 286.

*Second.* Mississippi determined that this tax was a privilege tax for carrying on the intrastate business of common carrier of oil in Mississippi, measured by a percentage of the income from that business. The preceding subdivision of this opinion expounds the arguments for our conclusion that all the business of appellant in operating a pipe line for transporting oil committed to move out-of-state from one point to another in Mississippi is interstate transportation. The statute in question was interpreted by Mississippi as laying a tax solely upon that business of transporting oil, not upon the "local activities of 'maintaining, keeping in repair, and otherwise in manning the facilities'" such as are discussed in the opinions in the undecisive case of *Memphis Gas Co.* v. *Stone,* 335 U. S. 80, at 92–93.

An opinion has been filed in this case, asserting that the Mississippi tax could be collected from the petitioner notwithstanding that its entire business is interstate commerce. With that conclusion we disagree.

Since appellant does only an interstate transportation business, the privilege tax exacted by Mississippi is actually a privilege tax for carrying on the interstate busi-

---

[13] *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282; *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50; *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 567.

ness of common carrier of oil, measured by a percentage of the gross income from that business, apportioned so as to include only income derived from that portion of the interstate commerce carried on wholly in Mississippi. The gross receipts from interstate commerce are the costs of carriage from point of origin—the field tanks—to the point of destination—the out-of-state refinery. As only that portion of the costs covering the carriage from origin to pipe-line loading racks, both points in Mississippi, is used to measure the privilege tax, it is clear that the interstate gross receipts are apportioned to carriage wholly within the state. Our issue at this point is whether a privilege tax for carrying on a wholly interstate transportation business measured by a fairly apportioned part of gross receipts for carriage in interstate commerce is constitutionally permissible.

Phrased in terms of a privilege for carrying on an interstate business, such a tax historically has been deemed unconstitutional. The cases abound in statements to the effect that the privilege of carrying on interstate commerce itself is immune from state taxation. This is because it is a privilege beyond the power of a state to grant. ". . . it is a right which every citizen of the United States [and every corporation] is entitled to exercise under the Constitution and laws of the United States; . . . ." *Crutcher* v. *Kentucky,* 141 U. S. 47, 57; *International Textbook Co.* v. *Pigg,* 217 U. S. 91. The cases hold not only that a state may not exact a tax as a condition precedent to the doing of interstate business, but also that it may not levy privilege, excise or franchise taxes on a foreign corporation for the privilege of carrying on or the actual doing of solely interstate business after its admission to the state.[14]  *Ozark Pipe Line Corp.* v.

---

[14] Since we perceive no difference for the purposes of this case between franchise, privilege, and excise taxes, insofar as they are exacted for the privilege of doing or the doing of interstate business,

*Monier,* 266 U. S. 555; *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203. Cf. *Anglo-Chilean Nitrate Sales Corp.* v. *Alabama,* 288 U. S. 218, in the light of *Southern Gas Corp.* v. *Alabama,* 301 U. S. 148, 153.[15] The decisions in these cases were reached in spite of the fact that in each of them the tax sought to be levied was fairly measured according to the connections of the corporate taxpayer with the state. Thus in *Ozark* the tax was measured by a percentage of the capital stock and surplus of the corporation employed in business in the state, that proportion being deemed employed within the state "that its property and assets in this State bears to all its property and assets wherever located"; in *Alpha* by a percentage of the value of the "corporate excess" employed within the commonwealth (determined as in *Ozark*) and a percentage of "that part of its net income . . . which is derived from business carried on within the Commonwealth" (also determined as in *Ozark*); in *Anglo-Chilean* by a percentage of capital employed in the state.

A recent pronouncement of this Court has recognized this limitation on state power. In *Aero Transit Co.* v. *Comm'rs,* 332 U. S. 495, we upheld a tax on motor carriers only after stressing the fact that the tax was "affirmatively laid for the privilege of using the state's highways" and was not imposed upon "the privilege of doing the interstate business." P. 504. See *Memphis Natural Gas Co.*

we have treated them as identical as far as their validity under the commerce clause is concerned. In *Ozark* and *Anglo-Chilean Nitrate* the taxes were called franchise taxes; in *Alpha* it was labeled an excise tax.

[15] See the discussion of these cases in the opinion of REED, J., in *Memphis Gas Co.* v, *Stone,* 335 U. S. 80. See also *New York ex rel. Pennsylvania R. Co.* v. *Knight,* 192 U. S. 21, 26; *State Tax Comm'n* v. *Interstate Natural Gas Co.,* 284 U. S. 41, 43.

v. *Stone*, 335 U. S. 80, 88, note 10.   Where the corporate taxpayer conducts intrastate as well as interstate business, a franchise privilege or excise tax on the former is of course permissible.[16]   We have frequently upheld such a tax although it ·was measured by property or receipts which were used in or attributable to interstate business.[17]

The growth of commerce that is carried on in more than one state has brought responsibilities to states other than the one in which the ·commerce may be said to have originated.   Producers, either directly or through middlemen and independent dealers, distribute natural resources, agricultural and manufactured products on a nation-wide scale.   Transportation runs across state lines.   All states are called upon to give governmental services for this commerce—service that costs and should be paid for by those who profit from its maintenance.   In the absence of congressional direction as to the taxation of interstate commerce, this Court has interpreted the commerce clause to permit state nondiscriminatory taxation, for the use of state facilities, upon the property used in interstate commerce, upon production for commerce and upon net proceeds therefrom.   Through such taxes, the states may exact payment for their protection and encouragement of commerce.   *Joseph* v. *Carter & Weekes Co.*, 330 U. S. 422, 429, and cases cited.   We have upheld, a tax on gross receipts from interstate transportation

---

[16] *Memphis Natural Gas Co.* v. *Beeler*, 315 U. S. 649; *Ford Motor Co.* v. *Beauchamp*, 308 U. S. 331; *Atlantic Refining Co.* v. *Virginia*, 302 U. S. 22; *Southern Natural Gas Corp.* v. *Alabama*, 301 U. S. 148; *Pacific Tel. Co.* v. *Tax Comm'n*, 297 U. S. 403; see collection of cases 105 A. L. R. 11, 36–56.

[17] *International Harvester Co.* v. *Evatt*, 329 U. S. 416; *Atlantic Lumber Co.* v. *Comm'r*, 298 U. S. 553; *Matson Nav. Co.* v. *State Bd. of Equalization*, 297 U. S. 441.

"when apportioned as to the mileage within the State."
*Greyhound Lines* v. *Mealey*, 334 U. S. 653, 663.[18]

Notwithstanding the wide latitude for taxation of incidents connected with interstate commerce, see *Memphis Gas Co.* v. *Stone*, 335 U. S. 80, this Court has never interpreted the commerce clause to allow a state tax for the privilege of carrying on interstate commerce or one upon that commerce itself. *Joseph* v. *Carter & Weekes Co.*, 330 U. S. 422. This is not because of the financial burden. Other taxes may equally burden the commerce. It is not because in transportation the same result cannot be obtained by levying a tax for intrastate activities measured by gross receipts appropriately apportioned to the activities in the state. It is because the commerce clause of the Constitution does not leave to the states any power to permit or refuse the carrying on of interstate commerce. It likewise bars a state from taxing the privilege of doing interstate commerce or the doing of interstate commerce, with or without fair apportionment even if not discriminatory.

*Maine* v. *Grand Trunk R. Co.*, commented upon in note 18, is inapposite to the taxation here attempted by Mississippi. Interstate did a wholly interstate business. *Grand Trunk*, concerning a tax on the privilege of exercis-

---

[18] This decision followed a prolonged controversy over the taxability of the proceeds of interstate commerce. *Maine* v. *Grand Trunk R. Co.*, 142 U. S. 217, has been cited for the same proposition, see e. g., *Adams Mfg. Co.* v. *Storen*, 304 U. S. 307, 329, although there is in the report of the case, p. 218, § 2 of the Act there in question, support for Mr. Justice Holmes' treatment of it in *Galveston, H. & S. A. R. Co.* v. *Texas*, 210 U. S. 217, 226, as a tax in lieu of ad valorem taxes. See *Joseph* v. *Carter & Weekes Co.*, 330 U. S. 422, at 427, notes 5, 6 and 7, and cases cited. *Western Live Stock* v. *Bureau*, 303 U. S. 250, 255. Powell, More Ado about Gross Receipts Taxes, 60 Harv. L. Rev. 501, 710, 747, *et seq.*; Dunham, Gross Receipts Taxes on Interstate Transactions, 47 Col. L. Rev. 211, 220 *et seq.*

ing a franchise in Maine, can only be reconciled with the later cases commented upon at note 15 if Grand Trunk did an intrastate as well as an interstate business. A state franchise tax for that is permissible. See notes 16 and 17, *supra*. The method of apportionment employed in the *Grand Trunk* case has had approval as recently as the *Greyhound* case, 334 U. S. at 663. There was no approval of *Grand Trunk* in *Greyhound* as a precedent for a tax on the privilege of doing an interstate business. See p. 658.

Control of interstate commerce passed into the hands of Congress and thus welded the Federation into a Nation. So long as states are forbidden to impose taxes upon interstate commerce or for the privilege of carrying it on, a toll cannot be exacted from interstate commerce even if a similar tax is borne by local commerce. So, interstate commerce is not susceptible to taxation, as such, and thus has been protected against exactions aimed at it, no matter how nondiscriminatory. It may be taxed only under enactments which likewise tax intrastate commerce for like intrastate activities. It gets no advantage over intrastate commerce from anything furnished by the state and pays the state nothing for what the state doesn't possess, that is, the power to allow interstate business within its borders.

All interstate commerce thus has free access to local markets, subject only to nondiscriminatory taxes such as the tax on apportioned gross receipts from intrastate mileage as in *Central Greyhound Lines* v. *Mealey, supra,* or the tax on disconnected local incidents as discussed in the opinions in *Memphis Gas Co.* v. *Stone, supra,* or in *International Harvester Co.* v. *Evatt, supra,* or *American Manufacturing Co.* v. *St. Louis,* 250 U. S. 459. So long as a tax on the privilege of doing interstate business or a tax on the doing of that business is prohibited, interstate commerce remains free from state exactions levied

on that commerce. Yet that commerce must bear, like intrastate commerce, the cost of those facilities or protections, apart from the interstate commerce itself, which the state furnishes or allows within its borders. Such has been and is the freedom that the commerce clause grants to those engaged in commerce between the states.

The judgment should be reversed.