2009 ME 52

## JOHN T. CYR & SONS, INC.

v.

## STATE TAX ASSESSOR.

Supreme Judicial Court of Maine.

Argued: Sept. 15, 2008.

Decided: May 14, 2009.

---

Christine Burke Worthen, Esq., (orally), Bernard J. Kubetz, Esq., Eaton Peabody, Bangor, for John T. Cyr & Sons, Inc.

G. Steven Rowe, Attorney General, Kelly L. Turner, Asst. Atty. General, (orally), Augusta, for State Tax Assessor.

Sarah H. Beard, Esq., Jonathan A. Block, Esq., Robert A. Creamer, Esq., Pierce Atwood, LLP, Portland, for amicus curiae Maine Motor Transport Association.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

SAUFLEY, C.J.

[¶ 1] We are asked to determine whether motor coaches owned and operated by John T. Cyr & Sons, Inc., are exempt from a statutory use tax pursuant to 36 M.R.S. § 1760(41) (2008), which exempts certain instrumentalities that operate in interstate commerce more than eighty percent of the time. The specific question presented is whether tour buses that take passengers from cruise ships in Portland Harbor to various Maine destinations and return the passengers to the cruise ships are operating in "interstate commerce" and are, based on that usage and other interstate usage, exempt from the Maine use tax pursuant to 36 M.R.S. § 1760(41). We agree with the Superior Court (Kennebec County, *Jabar*, J.) that the exemption set forth in section 1760(41) does not apply to tour buses that transport cruise ship passengers on excursions within Maine, and we affirm the judgment upholding the imposition of the tax.

I.  BACKGROUND

A.  Use Taxation

[¶ 2] With support from amicus curiae Maine Motor Transport Association, John T. Cyr & Sons, Inc., appeals from a judgment of the Superior Court affirming the State Tax Assessor's denial of Cyr's request for reconsideration of a use tax assessment on certain of Cyr's motor coaches by Maine Revenue Services. A use tax serves to equalize tax burdens between those who make purchases within the state for in-state use and those who make purchases outside of the state for in-state use:

The necessity of a use tax is obvious. It is well known that much personal property is purchased outside the borders of the state and brought into the state for use here. This State is without authority to tax sales beyond its territorial limits. Without some tax to complement and supplement the sales tax, not only would a tax advantage be enjoyed by the buyer who purchases outside of the state and uses that property here, but also local merchants would be at a disadvantage against competition by out of state merchants who may be able to offer

lower prices by reason of lower tax burdens. A typical illustration is the purchase of an automobile in a non-taxable state by a citizen of this state for use here. A Maine dealer is obliged to collect a sizeable tax on such a transaction when made in this state. Without a use tax the aggregate purchases of this character would result in a severe tax loss to the State, and present a serious handicap to Maine dealers.

*Hanbro, Inc. v. Johnson,* 158 Me. 180, 184, 181 A.2d 249, 251 (1962), *quoted in Brent Leasing Co. v. State Tax Assessor,* 2001 ME 90, ¶ 11, 773 A.2d 457, 460–61. Thus, unless an exemption applies, 36 M.R.S. § 1861 (2008) calls for taxation of the "use . . . in this State of tangible personal property or a service, the sale of which would be subject to tax under section 1764 ['Tax against certain casual sales'] or 1811 ['Sales tax']." The statutory exemption at issue in this appeal exempts from the use tax "[t]he sale of a vehicle . . . that is placed in use by the purchaser as an instrumentality of interstate or foreign commerce within 30 days after that sale and that is used by the purchaser not less than 80% of the time for the next 2 years as an instrumentality of interstate or foreign commerce." 36 M.R.S. § 1760(41). With this statutory framework in mind, we examine the facts to which the parties stipulated.

## B. Factual Background

[¶ 3] Cyr is a Maine corporation doing business in Old Town. At all relevant times, Cyr operated as a company providing school bus and motor coach transportation. Between August 2001 and March 2004, Cyr purchased twenty-six motor coaches that it believed qualified for the subsection (41) exemption from sales and use tax as instrumentalities operating in interstate commerce more than eighty percent of the time.

[¶ 4] Within thirty days after Cyr's purchase of the coaches, they were used for some interstate transport. During the next two years, the coaches were used for two distinct purposes: (1) to transport passengers across Maine state lines, and (2) to transport cruise ship passengers to and from Maine points. If the cruise passenger transportation is considered to be "interstate" commerce, then the coaches will have operated in interstate commerce for at least eighty percent of the time during the identified period, as provided in the statutory exemption to the use tax.

[¶ 5] Periodically during the use period, Cyr would provide coaches to DCNE, an independent tour operator based in Florida. Pursuant to written or verbal agreements with cruise lines, DCNE provided tour operators to conduct cruise passenger excursions on shore in Maine while the cruise ships remained in port. All contracts could be terminated by either the cruise line or DCNE upon notice.

[¶ 6] These on-shore excursions consisted primarily of day trips or tours in the Bar Harbor or Portland areas. The excursions included bus tours of Acadia National Park and the City of Portland, schooner cruises of Casco Bay, and walking tours of Bar Harbor between the months of May and October. The excursions did not, themselves, leave the State of Maine. The cruise lines determined which excursions were offered, and DCNE described the offerings in brochures provided to cruise passengers by the cruise lines. The brochures provided information regarding the nature of the tour, the type of transportation, the tour's duration, the duration of each "leg" of the tour, the physical requirements for the tour, and suggestions of proper clothing or footwear, depending on the nature of the tour. The cruise lines would select the excursions to be offered, and DCNE would make the appropriate

arrangements, including the reservation of coaches. DCNE would list all excursions offered on a particular date and assign "allotments" for each tour by determining how many coaches were available for each tour and establishing the minimum and maximum passenger capacity. A tour operator schedule was produced from this information.

[¶ 7] Passengers were invited to register for the excursions, subject to availability and based on passengers' physical limitations, after booking a cruise and receiving a cabin number. The excursions were optional; passengers could participate in an excursion, remain on the ship, or explore the port independently. Excursions were not offered to non-cruise ship passengers. Passengers were required to be aboard the cruise ship at the designated time of departure, whatever their choice.

[¶ 8] Passengers could book the excursions either by internet or telephone and had to pay for the excursions immediately. Eighty percent of excursions were booked before passengers boarded the cruise ships. A passenger could also book an excursion while aboard, subject to availability, up to seventy-two hours before arrival at the designated port. Roughly thirty days before each scheduled excursion, the cruise lines would confirm with DCNE the number of passengers registered. About seventy-two hours before a scheduled excursion, the cruise line would send DCNE a final head count for that excursion.

[¶ 9] The cruise lines accepted payment, processed registrations, and determined the passenger price for each excursion. In certain circumstances, such as inclement weather, a passenger could cancel a reservation and obtain a refund. The cruise lines could, at their discretion, cancel an excursion if the minimum number of passengers was not booked for that excursion. If more than the maximum number of passengers were interested in an excursion, the cruise line could contact DCNE to request an expansion of the maximum capacity. DCNE could either grant or deny this request, depending on motor coach availability, economy, and demand.

[¶ 10] Cyr provided DCNE with motor coach transportation for excursions during the use period, though these parties never executed a written agreement. DCNE would make written requests for motor coaches for the tour season, and Cyr would review the requests and advise DCNE whether it could provide coaches. If Cyr advised that it could not provide them, DCNE could make arrangement with other transportation providers, if necessary. Cyr could agree or refuse to provide coaches to DCNE in its sole discretion. DCNE could cancel its trips at any time without any penalty from Cyr.

[¶ 11] The cruise lines paid DCNE a negotiated and agreed upon rate. Cyr unilaterally set its rates on a per-coach/per-day basis and provided DCNE monthly invoices. Cyr has never had contact with any cruise lines.

[¶ 12] Cyr filed use tax exemption certificates for the twenty-six coaches with Maine Revenue Services. Maine Revenue Services audited the sales and use tax for the period of August 1, 2001, to March 31, 2004. Maine Revenue Services assessed use taxes, interest, and penalties on twenty of the twenty-six coaches purchased during the period on the basis that they were not exempt instrumentalities of interstate commerce. In sum, the use tax was $170,074.43, the interest was $51,576.96, and the penalties totaled $42,518.61.

[¶ 13] Cyr conceded that fourteen of the twenty taxed coaches did not qualify

for the exemption.[1] Accordingly, Cyr paid $83,220 in use taxes assessed on those fourteen coaches.

[¶ 14] Cyr requested reconsideration of the assessment on the six other coaches pursuant to 36 M.R.S. § 151 (2008). The State Tax Assessor upheld the assessment in writing on January 16, 2007. Cyr petitioned for judicial review by the Superior Court pursuant to 36 M.R.S. § 151.

[¶ 15] After considering the stipulated facts, the Superior Court affirmed the decision of the Assessor. The court reasoned that the exemption for instrumentalities of interstate commerce applies only as far as is necessary to avoid violation of the Commerce Clause. Because the court concluded that the assessment did not violate the Commerce Clause, it also held that the assessment complied with the taxing statute.

[¶ 16] Cyr appealed to us from the Superior Court's judgment.

## II. DISCUSSION

[¶ 17] Cyr's appeal turns on the interpretation of the statutory provision that exempts certain instrumentalities of interstate commerce from the use tax:

Subject to the provisions of section 1760–C, no tax on sales, storage or use may be collected upon or in connection with:

. . . .

**41. Certain instrumentalities of interstate or foreign commerce.** The sale of a vehicle, railroad rolling stock, aircraft or watercraft that is placed in use by the purchaser as an instrumentality of interstate or foreign commerce within 30 days after that sale and that is used by the purchaser not less than 80% of the time for the next 2 years as an instrumentality of interstate or foreign commerce. The State Tax Assessor may for good cause extend for not more than 60 days the time for placing the instrumentality in use in interstate or foreign commerce. *For purposes of this subsection, property is "placed in use as an instrumentality of interstate or foreign commerce" by its carrying of, or providing the motive power for the carrying of, a bona fide payload in interstate or foreign commerce,* or by being dispatched to a specific location at which it will be loaded upon arrival with, or will be used as motive power for the carrying of, a payload in interstate or foreign commerce. For purposes of this subsection, "bona fide payload" means a cargo of persons or property transported by a contract or common carrier for compensation that exceeds the direct cost of carrying that cargo or pursuant to a legal obligation to provide service as a public utility or a cargo of property transported in the reasonable conduct of the purchaser's own nontransportation business in interstate commerce.

36 M.R.S. § 1760 (2008)[2] (emphasis added). Unless this exemption applies, a use tax will be imposed pursuant to 36 M.R.S. § 1861.

[¶ 18] Cyr argues that by its plain meaning, section 1760(41) exempts the Cyr coaches from use taxation because they operated as instrumentalities "carrying . . . payload[s] in interstate . . . commerce"

---

1. The parties did not stipulate to facts explaining how the use of these fourteen coaches differed from the use of the six coaches at issue in the present appeal. We express no opinion regarding the fourteen coaches for which Cyr paid the use tax.

2. Although section 1760 has been amended since the taxation at issue here, *see, e.g.,* P.L. 2007, ch. 695, § A–44 (effective Apr. 24, 2008), subsection (41) has not been altered.

for the requisite portion of their use. 36 M.R.S. § 1760(41). Specifically, Cyr contends that the payload of cruise ship passengers was in interstate commerce because the passengers did not originate or terminate their cruises in Maine and were continuing interstate journeys available only to these cruise ship passengers—not members of the general public. Finally, Cyr contends that the Superior Court misapplied the statute by relying on interpretations of the Commerce Clause when the statutory provision should be interpreted to provide a broader exemption.

[¶ 19] Amicus curiae Maine Motor Transport Association explicitly requests that we reconsider our recent holding that the section 1760(41) exemption permits taxation that does not violate the Commerce Clause. *See Brent Leasing,* 2001 ME 90, 773 A.2d 457. According to the Association, the Legislature must have intended for the statute to exempt more than those instrumentalities that it would be unconstitutional to tax pursuant to the Commerce Clause because it enacted a statute that was different from the four-part test established several years earlier by the United States Supreme Court for Commerce Clause analysis in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326, *reh'g denied,* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977).[3]

A.  Standard of Review

■  [¶ 20] Title 36 M.R.S. § 151 governs judicial review of the Assessor's decision. *Foster v. State Tax Assessor,* 1998 ME 205, ¶ 7, 716 A.2d 1012, 1014. Although the Superior Court is authorized to conduct a de novo hearing on the matter, *see* 36 M.R.S. § 151; *Foster,* 1998 ME 205, ¶ 7, 716 A.2d at 1014, the parties here stipulated to the facts. Because the Superior Court decided only issues of law, we will review de novo its interpretations of the statutory exemption and our case law. *See Foster,* 1998 ME 205, ¶ 7, 716 A.2d at 1014; *see also Mason v. City of Augusta,* 2007 ME 101, ¶ 18, 927 A.2d 1146, 1151.

B.  Viability of *Brent Leasing*

■  [¶ 21] We held in *Brent Leasing* that the subsection (41) exemption applies "only when the Commerce Clause requires an exemption from the use tax." 2001 ME 90, ¶ 14, 773 A.2d at 461. Due to the absence of any expressed legislative intent "to broaden the scope of the exemption beyond what it was constitutionally required to exempt," we adopted a narrow reading of the exemption. *Id.* 15, ¶ 773 A.2d at 462. Specifically, we posited in *Brent Leasing* that it was "highly doubtful, given the purpose of the use tax [to minimize unfair competition between interstate and intrastate sales of tangible personal property], that the Maine Legislature intended to exempt more instrumentalities placed in foreign commerce than the federal constitution requires." *Id.* ¶¶ 11, 14, 773 A.2d at 460, 461.

■  [¶ 22] To determine whether the reasoning and holding of *Brent Leasing* should remain in force, we rely on principles of stare decisis. The doctrine of

---

**3.**  The four factors were described as follows in the Maine case of *Brent Leasing Co. v. State Tax Assessor:*

A tax on instrumentalities of interstate commerce must meet four requirements: (1) it can only be applied to an activity with a substantial nexus with the taxing state; (2) it must be fairly apportioned; (3) it cannot discriminate against interstate commerce; and (4) it must be fairly related to the services provided by the state.

2001 ME 90, ¶ 13 n. 6, 773 A.2d 457, 461 (citing *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326, *reh'g denied,* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977)).

stare decisis "embodies the important social policy of continuity in the law by providing for consistency and uniformity of decisions." *Bourgeois v. Great N. Nekoosa Corp.*, 1999 ME 10, ¶ 5, 722 A.2d 369, 371. According to this doctrine, Maine courts are bound by our " 'deliberate or solemn decision ... after argument on a question of law fairly arising in the case, the disposition of which is necessary to the determination of the case.' " *Id.* (quoting *Myrick v. James*, 444 A.2d 987, 997–98 (Me.1982)). Unless the prevailing precedent " 'lacks vitality and the capacity to serve the interests of justice,' " we will not disturb that settled precedent. *Id.* (quoting *Myrick*, 444 A.2d at 1000).

[¶ 23] Here, although the parties disagree about how to interpret section 1760(41), neither Cyr nor the Association have demonstrated that the interpretation announced in *Brent Leasing* in 2001 has become obsolete or has come to undermine the interests of justice in such a way that principles of stare decisis must cede to a new interpretation. *See Bourgeois*, 1999 ME 10, ¶ 5, 722 A.2d at 371. Although the Association is correct that subsection (41) does not track the language of the United States Supreme Court's *Complete Auto Transit* test, the analysis required by that test is subsumed in the Commerce Clause analysis described in *Brent Leasing*. *See* 2001 ME 90, ¶ 13 & n. 6, 773 A.2d at 461. Specifically, *Brent Leasing* recognized,

> A tax on instrumentalities of interstate commerce must meet four requirements: (1) it can only be applied to an activity with a substantial nexus with the taxing state; (2) it must be fairly apportioned; (3) it cannot discriminate against interstate commerce; and (4) it must be fairly related to the services provided by the state.

*Id.* (citing *Complete Auto Transit*, 430 U.S. at 279, 97 S.Ct. 1076). This analysis demonstrates the consideration of the factors set forth in *Complete Auto Transit* and the conclusion that the factors were part of any section (41) analysis. We decline the Association's invitation to overrule *Brent Leasing*.

[¶ 24] We further note that we need not apply this four-factor test in the case before us. The question central to Cyr's appeal is not whether the four factors have been met. Rather, the question is whether the *predicate* to the four-factor test has been met—that is, whether the Cyr coaches were used in interstate commerce when they transported interstate cruise passengers on bus excursions within Maine. *See id.* (stating that the four factors must be satisfied if a state wishes to tax "instrumentalities of interstate commerce"). The relevant cases in determining whether Cyr's coaches were operating in interstate or foreign commerce are those that consider what sorts of activities affect interstate or foreign commerce so as to implicate the Commerce Clause. We therefore examine the Commerce Clause and relevant court cases construing it.

**C. Interpretation of the Commerce Clause**

[¶ 25] The Commerce Clause, in addition to establishing the power of the United States Congress "[t]o regulate Commerce ... among the several States," U.S. Const. art. I, § 8, cl. 3, limits the regulatory power of the states. *See Fulton Corp. v. Faulkner*, 516 U.S. 325, 330, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). The so-called dormant Commerce Clause prohibits states from adopting "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Fulton Corp.*, 516 U.S. at

330, 116 S.Ct. 848 (quotation marks omitted). In this manner, the Commerce Clause prevents any state from isolating itself economically by burdening the flow of commerce across its borders in a way that commerce within the state is not burdened. *Id.* at 330–31, 116 S.Ct. 848.

[¶ 26] To determine whether the Assessor's interpretation of the use tax exemption is consistent with the meaning of interstate commerce as that concept has been construed for purposes of the Commerce Clause, we examine primarily United States Supreme Court precedent. Although the Court has held that some intrastate carriers are sufficiently engaged in interstate commerce to be regulated by the federal government, it has also held that activities that primarily implicate intrastate commerce may not be regulated by the federal government due to the Commerce Clause. For instance, the Court held that the use of taxis to transport train travelers with their luggage does not sufficiently affect interstate commerce to be regulated by the federal Sherman Act.[4] *United States v. Yellow Cab Co.,* 332 U.S. 218, 228–34, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), *overruled in part on other grounds, Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 760–77, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Because, in the *Yellow Cab* case, the use of taxis for train passenger transportation was intermingled with the local use of taxicabs for *intrastate* commerce and did not serve train passengers exclusively, *id.* at 230–31, 67 S.Ct. 1560, the Court held that "such transportation [was] too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act," *id.* at

230, 67 S.Ct. 1560. The taxis in the *Yellow Cab* case had "no contractual or other arrangement with the interstate railroads. Nor [were] their fares paid or collected as part of the railroad fares." *Id.* at 231, 67 S.Ct. 1560. In these circumstances, the Court concluded that the taxis' "relationship to interstate transit [was] only casual and incidental." *Id.*

[¶ 27] In an earlier case, the Supreme Court similarly held that cab service rendered entirely within a state based on an independent contract, and without any "contractual or necessary relation to interstate transportation," was presumably subject to state control. *State of New York ex rel. Pa. R.R. Co. v. Knight,* 192 U.S. 21, 27, 24 S.Ct. 202, 48 L.Ed. 325 (1904). The Court held that "the cab service is an independent local service, preliminary or subsequent to any interstate transportation." *Id.* at 28, 24 S.Ct. 202.

[¶ 28] By contrast, the Court has permitted federal regulation of carriers whose intrastate activities are integral to interstate commerce. For instance, a carrier that initially operated between the District of Columbia and Virginia but began operating entirely within the District of Columbia still substantially affected interstate commerce because the transportation of passengers within D.C. was integral to their travel to locations in Virginia. *United States v. Capital Transit Co.,* 338 U.S. 286, 288–90, 70 S.Ct. 115, 94 L.Ed. 93 (1949). The Court held that the transportation was subject to federal regulation because it was "part of a continuous stream of interstate transport" and the intra-District transporting of passengers formed "an integral part of an interstate movement." *Id.* at 290, 70 S.Ct. 115.

---

**4.** The Sherman Act is limited in reach based on the Commerce Clause. *See United States v. Frankfort Distilleries, Inc.,* 324 U.S. 293, 301, 65 S.Ct. 661, 89 L.Ed. 951 (1945) ("[T]he Sherman Law, deriving its authority from the Commerce Clause, can have no greater potency than the Commerce Clause itself.").

[¶ 29] The Supreme Court also held that the federal Sherman Act could be applied to fee-setting for title searches by a county bar association and the Virginia State Bar because the fee-setting affected interstate commerce. *Goldfarb v. Va. State Bar,* 421 U.S. 773, 783–86, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). The Court held that, because title searches are necessary, and because significant funds and financing for real estate purchases come from out-of-state, the fee-setting affected interstate commerce for purposes of the Sherman Act. *Id.*

[¶ 30] In cases reviewing the constitutionality of state taxation, the Court has similarly examined multiple factors to determine whether a state was attempting to tax interstate commerce. The Court upheld a Mississippi tax imposed on a pipe line that transported oil in-state for the purpose of moving the oil from one out-of-state location to another. *Interstate Oil Pipe Line Co. v. Stone,* 337 U.S. 662, 663–68, 69 S.Ct. 1264, 93 L.Ed. 1613 (1949). The tax was imposed on the privilege of doing business in Mississippi, *id.* at 664, 69 S.Ct. 1264, and the Court upheld the imposition of the tax because all activities generating the tax were carried on in Mississippi, the state did not tax the pipe line company more heavily than it taxed those engaged in intrastate commerce, and there was no attempt to tax interstate activities carried on outside Mississippi's borders. *Id.* at 667–68, 69 S.Ct. 1264.

[¶ 31] The Court has similarly held that the Commerce Clause permits states to tax activities such as loading and unloading cargo from other states or countries because they do not implicate the dormant Commerce Clause. *See Dep't of Revenue of Wash. v. Ass'n of Wash. Stevedoring Cos.,* 435 U.S. 734, 743–51, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). The Court upheld a Washington business and occupation tax imposed on a stevedoring company against a facial challenge to its constitutionality. *See id.* at 740, 743–51, 98 S.Ct. 1388. The Court further concluded that the tax was not unconstitutional as applied because the stevedoring companies operated entirely within Washington, the companies failed to demonstrate any unfair apportionment of the tax, and "nothing in the record suggest[ed] that the tax [was] not fairly related to services and protection provided by the State." *Id.* at 750–51, 98 S.Ct. 1388.

[¶ 32] In a state supreme court case analogous to the facts stipulated by Cyr, the Supreme Court of Wisconsin considered whether a company that leased a boat for the purpose of providing sightseeing and dinner cruises on the Mississippi River was engaged in interstate commerce. *La Crosse Queen, Inc. v. Wisconsin Dep't of Revenue,* 208 Wis.2d 439, 561 N.W.2d 686, 687 (1997). The passengers embarked and disembarked in La Crosse, Wisconsin, but the boat traveled into Minnesota waters during its excursion. *Id.* at 688. The Wisconsin Supreme Court held that there was no interstate commerce or business carried on because of the incidental passing into Minnesota waters. *Id.* at 688–89. The court also held that the use of the riverboat could not be understood as part of a greater journey because "the purpose of the excursions on the La Crosse Queen was recreation and entertainment; it was not intended by anybody to serve as transportation." *Id.* at 689. The excursion was not an absolute necessity as with a ferry to an island or any other necessary link for the completion of an interstate journey. *Id.* at 689–90. Rather, the court stated, "[t]he La Crosse Queen's journey ends where it begins, with no stops in between."

*Id.*[5]

[¶ 33]   This type of recreational round-trip journey differs from a situation in which a payload is moved in a continuous stream of commerce from a point of origin in one state to a destination in another state. *See Alvan Motor Freight, Inc. v. Dep't of Treasury*, 281 Mich.App. 35, 761 N.W.2d 269, 274 (2008).   In such circumstances, a carrier may be found to be acting in interstate commerce even if it carries the payload during a portion of the transport that occurs exclusively within a single state. *Id.*

D.   Application of the Statute to the Cyr Coaches

[¶ 34]   Here, Cyr entered into a contract with DCNE to take only interstate cruise ship passengers who wished to participate on excursions within Maine. Based on the stipulated facts of this case, the coach tours offered by Cyr do not affect interstate commerce because (1) they originate and terminate within Maine; (2) they are an optional—not a necessary—part of the cruise passengers' interstate travel experience; and (3) the imposition of the use tax does not result in the disproportionate taxation of an interstate instrumentality. *See Ass'n of Wash. Stevedoring Cos.*, 435 U.S. at 750–51, 98 S.Ct. 1388; *Capital Transit Co.*, 338 U.S. at 288–90, 70 S.Ct. 115; *Interstate Oil Pipe Line Co.*, 337 U.S. at 667–68, 69 S.Ct. 1264; *Brent Leasing*, 2001 ME 90, ¶¶ 2, 13 & n. 6, 773 A.2d at 458, 461; *La Crosse Queen*,

561 N.W.2d at 688–90.   Although it is relevant that Cyr contracted with an out-of-state entity to provide the bus excursions, *cf. Yellow Cab Co.*, 332 U.S. at 231–32, 67 S.Ct. 1560 (involving a cab service that had no contractual relation to interstate commerce); *Knight*, 192 U.S. at 27, 24 S.Ct. 202 (same), this consideration alone does not place the motor coaches in interstate commerce for purposes of the Commerce Clause and subsection (41).   Rather, we must examine all relevant facts when determining whether an instrumentality is operating in interstate or foreign commerce.   *See, e.g., Goldfarb*, 421 U.S. at 783–86, 95 S.Ct. 2004; *Capital Transit Co.*, 338 U.S. at 288–90, 70 S.Ct. 115; *Yellow Cab Co.*, 332 U.S. at 228–34, 67 S.Ct. 1560.

[¶ 35]   Based on all of the facts set forth in the parties' stipulations, the six Cyr coaches were not operating in interstate commerce when they took cruise ship passengers on recreational excursions within the State of Maine.   The coaches did not further the passengers' interstate journey, they did not cross state lines, and they did not move the passengers from their arrival in Maine toward another state.   The Cyr coaches did not, therefore, qualify for the exemption set forth in section 1760(41).[6]   Accordingly, we affirm the judgment of the Superior Court affirming the decision of the State Tax Assessor to uphold the imposition of the use tax by Maine Revenue Services.

---

**5.**   The *La Crosse Queen* case is factually similar to *Brent Leasing*.   There, a whale-watching cruise transported passengers from the Maine coast into international waters and back.   *See Brent Leasing*, 2001 ME 90, ¶ 2, 773 A.2d at 458.   Because the parties in *Brent Leasing* agreed that, if Brent Leasing did engage in foreign commerce, Maine's taxation of such commerce did not violate the Commerce Clause pursuant to the *Complete Auto Transit* test, *id.* ¶ 13 & n. 6, 773 A.2d at 461, it

was irrelevant to our analysis whether the instrumentality actually operated in foreign commerce, and we did not make a determination on that issue.

**6.**   We need not reach the four-part *Complete Auto Transit* test because we have concluded that the coaches were not operating in interstate commerce.   *See Brent Leasing*, 2001 ME 90, ¶ 13 & n. 6, 773 A.2d at 461.