73 So.2d 765

## CITY OF GADSDEN

v.

## ROADWAY EXPRESS, Inc.

### 7 Div. 252.

Court of Appeals of Alabama.

June 1, 1954.

Rehearing Denied June 22, 1954.

Lusk, Swann & Burns, Gadsden, for appellee.

Copeland & Copeland and Geo. C. Hawkins, Gadsden, for appellant.

Meyer U. Newfield and Geo. B. Foss, Jr., Birmingham, for City of Birmingham, amici curiae.

PRICE, Judge.

The case was submitted below on the following agreed statement of facts:

"1. The Plaintiff is a municipal corporation organized under the laws of the State of Alabama and located in Etowah County, Alabama; the Defendant is a corporation organized under the laws of the State of Ohio, with its principal office located at Akron, Ohio, and has qualified to do business in Alabama.

"2. During the years 1945, 1946, 1947, 1948, and 1949 the Defendant was engaged in business as an interstate common carrier of freight and was operating in the State of Alabama and had complied with the provisions of the Act of the Legislature of Alabama approved July 5, 1940, known as 'Alabama Carrier Act of 1939' [Code 1940, Tit. 48, § 301(1a) et seq.] and held a certificate of convenience and necessity issued by the Alabama Public Service Commission, authorizing it to transport freight by motor trucks for hire to and from various points without the State of Alabama to and from various points within the State of Alabama, including the City of Gadsden, and during said years, the Defendant paid all taxes, fees and licenses authorizing it to engage in such business, and complied with all of the requirements of the Alabama Public Service Commission, and paid licenses on and purchased license tax for the motor vehicles used by it in the operation of its said business, and complied with all laws and requirements of any kind of the State, County or Cities in the State of Alabama, except that it did not pay license taxes to the City of Gadsden under the Ordinance hereinafter set forth for the operation of a motor terminal in the City of Gadsden.

"3. During the said years, 1945, 1946, 1947, 1948 and 1949, the Defendant maintained within the City of Gadsden a motor terminal for the distribution and collection of freight transported from without the State of Alabama into the City of Gadsden and transported from the City of Gadsden to points without the State of Alabama; that in the operation of said terminal, freight handled by the defendant was transported from points without the State of Alabama into the City of Gadsden and was distributed to the various consignees from said terminal by motor trucks owned by the defendant; that said motor trucks picked up freight from consignors located within the City of Gadsden by its local trucks and assembled same in said terminal for transportation to points without the State of Alabama; that all shipments of freight brought into the City of Gadsden originated outside the State of Alabama and were directed to named consignees within said City; that some of said shipments were in full truck loads which were transported into said City and to the place of business of the named consignee therein and there delivered direct from the truck; that in instances of less than full truck loads, each shipment of freight was shipped direct to a named consignee and, as to these shipments, were temporarily unloaded from the trucks at defendant's terminal in Gadsden and, in the process and method of delivery, were loaded from said terminal on to smaller trucks owned by the defendant and continued in process of delivery by being taken or delivered to the named consignees; that all full truck load shipments going out of the City of Gadsden to points outside the State of Alabama, were loaded at the consignor's place of business on to the defendant's trucks and transported direct to the consignee; that less than full truck load shipments going out of the City of Gadsden to points outside the State of Alabama, were loaded at the consignor's place of business in said city on to the defendant's trucks and carried to defendant's terminal in said city and, when a sufficient amount of said freight had been accumulated, were loaded into defendant's trucks and transported to the various consignees outside

the State of Alabama; that at no point in the transportation of said freight was there any change in ownership, title or destination; that in the operation of its business as a motor carrier, for hire, it drove its motor vehicles upon the public streets of the City of Gadsden and unloaded said freight to the persons to whom consigned and picked up freight from persons located in the City of Gadsden consigned to points without the State of Alabama and transported the same to its terminal for delivery to consignees located without the State of Alabama; that the defendant, during said years, did no business in the City of Gadsden, or in the police jurisdiction thereof, by receiving freight of any kind for transportation for hire between said City of Gadsden and any other point in Alabama, nor did the defendant pick up or deliver freight from any point within the State of Alabama and outside the City of Gadsden and the police jurisdiction thereof for delivery into the City of Gadsden, nor did the defendant, during said years, engage in any business in the City of Gadsden other than that of transporting freight from points outside the State of Alabama into said City of Gadsden and delivering the same, as aforesaid, and picking up freight in said City of Gadsden and delivering the same to points outside the State of Alabama, as aforesaid, and maintaining said terminal, as aforesaid.

"That because less than truck load shipments characteristically vary greatly in size, weight, and in the miscellaneous nature of the articles involved; because they are received from or consigned to so many different shippers or receivers located at different points throughout the City of Gadsden and police jurisdiction thereof; and because the trucks transporting such shipments to or from Gadsden also contain freight moving to or from other cities which precludes them from stopping at Gadsden to perform local pick-up and delivery services, the operation of the aforesaid terminal for the handling of less than truck load freight is an integral and essential part of defendant's interstate operation.

"4. That on the 22nd day of November, 1949, the City of Gadsden duly and legally passed and adopted the following Ordinance, which is in words and figures, as follows:

" 'Be It Ordained By the Board of Commissioners of the City of Gadsden As Follows: Section One: Any person, firm or corporation operating within the City of Gadsden, Alabama, any bus terminal or freight terminal shall take out a license and pay to the City therefor the sum of $200.00.

" 'Section Two: Any person, firm or corporation operating within the City of Gadsden, Alabama, any motor bus terminal or any terminal or station facilities for the transportation of passengers, property or express transported by motor carrier shall take out a license and pay to said City therefor the sum of $200.00.

" 'Section Three: Any motor carrier doing business in the City of Gadsden, Alabama, by receiving passengers or freight for transportation for hire between said City and another point in Alabama shall take out a license and pay to said City therefor the sum of $200.00.

" 'Section Four: The term "motor carrier" as used in this ordinance shall include both a common carrier by motor vehicle and a contract carrier by motor vehicle; and the term "common carrier by motor vehicle" shall be deemed to mean any person, firm or corporation who or which undertakes, whether directly or by a lease or other arrangement, to transport passengers of property or any class, or classes, of property for the general public in the State of Alabama by motor vehicle for compensation, whether over regular or irregular routes, or whether between fixed termini or not; and the term "contract carrier by motor vehicle" means any person, firm or corporation not included under the above definition of common carrier by motor vehicle, who or which, under a special or individual contract or agreement, under special or individual contracts of special or individual agreements, whether directly or by lease, or any other arrangement, transports passengers or property by motor ve-

hicle for compensation in the State of Alabama.

" 'Section Five: The payment of license fee provided for under any one of the first three sections of this ordinance shall exempt licensee so paying from the payment of any license due under the other sections of this ordinance and any license due by said licensee under Sub-Section 67 or Sub-Section 250 of Ordinance No. 1681, setting forth the license schedule for 1949 of the City of Gadsden, Alabama; and payment by any person, firm or corporation of the license required under Sub-Section 67 or Sub-Section 250 of said Ordinance No. 1681 shall relieve such licensee of the duty of complying with the terms of this ordinance.

" 'Section Six: The licenses provided for in this ordinance shall become due and payable immediately on the adoption of this ordinance and shall be delinquent on December 1, 1949, and shall expire with the calendar year 1949.

" 'Section Seven: The licenses provided for in this ordinance shall be subject to the provisions of Title 37, Section 753, Code of Alabama, 1940.'

"5. That on the 16th day of December, 1947, the City of Gadsden duly and legally passed and adopted the following Ordinance, which is in words and figures, as follows:

" 'Be It Resolved By the Board of Commissioners of the City of Gadsden, Alabama, As Follows: Section 1. License Schedule. The following is hereby declared to be the schedule of licenses for the year commencing January 1, 1948, and ending December 31, 1948, for divers businesses, vocations, occupations or professions engaged in or carried on in the City of Gadsden, Alabama, and/or within the police jurisdiction thereof, and each and every person, firm, company, association or corporation engaged in any of the businesses, vocations, occupations or professions herein enumerated shall pay for and take out such licenses, and in such sums as are herein provided, to-wit:

" 'Bus Terminals and/or Freight Terminals * * * $200.00'

"6. That on the 17th day of December, 1946, the City of Gadsden, duly and legally passed and adopted the following Ordinance, which is in words and figures as follows:

" 'Be It Ordained by the Board of Commissioners of the City of Gadsden, Alabama, As Follows: Section 1. License Schedule. The following is hereby declared to be the schedule of licenses for the year commencing January 1, 1947, and ending December 31, 1947, for divers businesses, vocations, occupations and professions engaged in or carried on in the City of Gadsden, Alabama, and/or within the police jurisdiction thereof, and each and every person, firm, company, association or corporation engaged in any of the businesses, vocations, occupations or professions herein enumerated shall pay for and take out such licenses, and in such sums as are herein provided, to-wit:

" 'Bus Terminals and/or Freight Terminals * * * $200.00'

"7. That on the 18th day of December, 1945, the City of Gadsden duly and legally passed and adopted the following ordinance, which is in words and figures, as follows:

" 'Be It Ordained By the Board of Commissioners of the City of Gadsden, Alabama, As Follows: Section 1. License Schedule. The following is hereby declared to be the schedule of licenses for the year commencing January 1, 1946, and ending December 31, 1946, for divers businesses, vocations, occupations and professions engaged in or carried on in the City of Gadsden, Alabama, and/or within the police jurisdiction thereof, and each and every person, firm, company, association or corporation engaged in any of the businesses, vocations, occupations or professions herein enumerated shall pay for and take out such licenses, and in such sums as are herein provided, to-wit:

" 'Bus Terminals and/or Freight Terminals * * * $200.00'

"8. That on the 12th day of December, 1944, the City of Gadsden duly and legally passed and adopted the following Ordinance, which is in words and figures, as follows:

" 'Be It Ordained by the Board of Commissioners of the City of Gadsden, Alabama, As Follows: Section 1. License Schedule. The following is hereby declared to be the schedule of licenses for the year commencing January 1, 1945, and ending December 31, 1945, for divers businesses, vocations, occupations and professions engaged in or carried on in the City of Gadsden, Alabama, and/or within the police jurisdiction thereof, and each and every person, firm, company, association or corporation engaged in any of the businesses, vocations, occupations or professions herein enumerated shall pay for and take out such licenses, and in such sums as are herein provided, to-wit:

" 'Bus Terminals and/or Freight Terminals. * * * $200.00.'

"9. The plaintiff has from time to time demanded that the defendant pay the licenses under the ordinances set out in the preceding paragraphs and as alleged in the several counts of the complaint, and the defendant has refused to pay the same.

"10. This cause is submitted to the court for decision on the foregoing statement of facts."

The City of Gadsden sued to recover the unpaid license tax. On the trial judgment was rendered for defendant, and plaintiff prosecutes this appeal.

The authority for the imposition by the City of such a license tax is found in Sec. 301(31) of Title 48, Code 1940. In Acme Freight Lines v. City of Dothan, 242 Ala. 468, 6 So.2d 595, the tax provided by this code section was characterized as a privilege license for operating terminal facilities in the City.

The question here is whether or not the application of the privilege license ordinance of the City of Gadsden to defendant violates the commerce clause of the Federal Constitution, Art. 1, Sec. 8, Cl. 3.

The City's contention in justification of the tax is that although it is stipulated that the operation of the terminal is an essential part of appellee's interstate business, it was not indispensable, since a large part of the business is carried on without resort to the terminal facilities, and that the license tax for the operation of the terminal is imposed upon a local incident sufficiently disjoined from interstate commerce to permit the levy.

"It long has been settled that a state cannot lay a tax on interstate commerce in any form, whether on the transportation of subjects of commerce, the receipts derived therefrom, or the occupation or business of carrying it on." Ozark Pipe Line Corp. v. Monier, 266 U.S. 555, 45 S.Ct. 184, 185, 69 L.Ed. 439. Citing Leloup v. Port of Mobile, 127 U.S. 640, 8 S.Ct. 1380, 32 L.Ed. 311 and Kansas City, Ft. S. & M. R. Co. v. Botkin, 240 U.S. 227, 36 S.Ct. 261, 60 L.Ed. 617.

In Leloup v. Port of Mobile, supra, 127 U.S. 640, 8 S.Ct. 1382, it was said, "ordinary occupations are taxed in various ways, and, in most cases, legitimately taxed. But we fail to see how a state can tax a business or occupation, when it cannot tax the business itself. Of course, the exaction of a license tax as a condition of doing any particular business is a tax on the occupation; and a tax on the occupation of doing a business is surely a tax on the business."

As authority for its contention that "privileges closely connected with an exclusively interstate business may be regarded as distinct, or as a local incident of such interstate business for the purpose of taxation," appellant cites, among others, Joseph v. Carter & Weekes Stevedoring Co., 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993; Memphis Natural Gas Co. v. Stone, 335 U.S. 80, 68 S.Ct. 1475, 92 L.Ed. 1832; Interstate Oil Pipe Line Co. v. Stone, 337 U.S. 662, 69 S.Ct. 1264, 93 L.Ed. 1613; Coverdale v. Arkansas-Louisiana Pipe Line Co., 303 U.S. 604, 58 S.Ct. 736, 82 L.Ed. 1043; Spector Motor Service v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573.

These cases take note of the rule that, "If the business taxed is in fact separate local business, not so connected with interstate commerce as to render the tax a burden upon such commerce, the tax is good." Ozark Pipe Line Corp. v. Monier, supra.

As to the Joseph case, supra, in Sanford Service Co. v. City of Andalusia, 256 Ala. 507, 55 So.2d 856, 858, Judge Foster had this to say of the holding of the U.S.Sup. Ct.:

"In the Joseph case, supra, the business of the taxpayer was that of stevedoring, serving vessels in interstate commerce. The court struck down the tax declaring that stevedoring is an essential part of the commerce, and the tax was upon the privilege of conducting that business measured by a percentage of the gross receipts and was an interference by the state with the freedom of interstate commerce. It was a burden primarily on interstate commerce."

In the Coverdale case, supra [303 U.S. 604, 58 S.Ct. 737]:

"The question is whether a state statute imposing a privilege tax on the production of mechanical power contravenes the interstate commerce clause in so far as it is applied to an engine used to supply mechanical power to a compressor which increases the pressure of natural gas and thus permits it to be transported to purchasers in other states.

\* \* \* \* \* \*

"The power used by the appellee is obtained from internal combustion engines which transform the potential energy of natural gas into mechanical power, transmitted by piston and piston-rod from the combustion chamber of the engine to the compression chamber of the compressor. While the engine and compressor units are assembled on a common bed plate, their functions are thus seen to be as completely separate as if they operated through belting. The engine is the 'prima mover' of the tax act, producing power to drive the compressor. While the use of the engine for the production of power synchronizes with the transmission of that power to the compressor, production occurs prior to transmission. It is just as much local as the generation of electrical power."

The tax was upheld because it was said to be levied for the privilege of operating pumping machinery or other equipment as incidents apart from the flow of the interstate commerce, and the generation of "electric energy for the operation of such stations was subject to state taxation without violation of the Commerce Clause." Memphis Natural Gas Co., supra [335 U.S. 80, 68 S.Ct. 1479], in citing the Coverdale case.

In Memphis Natural Gas Co. v. Stone, the State of Mississippi imposed a franchise or excise tax on all foreign corporations doing business in the State equal to $1.50 of each $1,000.00 of the value of capital used, invested or employed within the State. The act provided:

"It being the purpose of this section to require the payment of a tax by all organizations not organized under the laws of this state, measured by the amount of capital or its equivalent, for which such organization received the benefit and protection of the government and laws of the state."

The Supreme Court of Mississippi said the State had made "no attempt to tax interstate commerce as such, but the levy is an exaction which the State requires as a recompense for its protection of lawful activities carried on in this state by the corporation, foreign or domestic, activities which are incidental to the powers and privileges possessed by it by the nature of its organization—here the local activities in maintaining, keeping in repair, and otherwise in manning the facilities of the system throughout the 135 miles of its line in this State." In affirming the State court the U. S. Supreme Court held: "We think that the state is within its constitutional rights in exacting compensation under this statute for the protection it affords the activities within its borders. Of course, the interstate commerce could not be conducted without these local activities. But that fact is not conclusive. These are events apart

from the flow of commerce. This is a tax on activities for which the state, not the United States, gives protection and the state is entitled to compensation when its tax cannot be said to be an unreasonable burden or a toll on the interstate business."

In Interstate Oil Pipe Line Co. v. Stone, supra, the tax was sustained on the principle that "where a taxpayer is engaged both in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer's business done within the state, including both interstate and intrastate." Spector Motor Service v. O'Connor, supra.

In Spector Motor Service supra [340 U.S. 602, 71 S.Ct. 511], the proceeding attacked the validity of a state tax imposed upon the franchise of a foreign corporation for the privilege of doing business within the State of Connecticut when (1) the business consists solely of interstate commerce and (2) the tax is computed at a non discriminatory rate on that part of the corporations net income which is reasonably attributable to its business activities within the State. "Petitioner's business is the interstate transportation of freight by motor truck between east and west. When a full truck-load is to be shipped to or from any customer in Connecticut, petitioner's over-the-road trucks go directly to the customer's place of business. In the case of less-than-truckload shipments, pickup trucks operated by petitioner gather the freight from customers for assembly into full truckloads at either of two terminals maintained within the State. 'The pickup trucks merely act as a part of the interstate transportation of the freight.' "

The Supreme Court of Connecticut upheld the tax, although it held it to be a tax for the privilege of engaging in interstate commerce. The U. S. Supreme Court, in holding the application of the tax invalid, stated:

"The incidence of the tax is upon no intrastate commerce activities because there are none. Petitioner is engaged only in interstate transportation. * * * The tax does not discriminate between interstate and intrastate commerce. Neither the amount of the tax nor its computation need be considered by us in view of our disposition of the case. The objection to its validity does not rest on a claim that it places an unduly heavy burden on interstate commerce in return for protection given by the State. * * * It is a 'tax or excise' placed unequivocally upon the corporation's franchise for the privilege of carrying on exclusively interstate transportation in the State."

"Taxing power is inherent in sovereign states, yet the states of the United States have divided their taxing power between the Federal Government and themselves. They delegated to the United States the exclusive power to tax the privilege to engage in interstate commerce when they gave Congress the power 'to regulate Commerce with foreign Nations and among the several States * * *.' U. S. Constitution Art. I, § 8, cl. 3. While the reach of the reserved taxing power of a state is great, the constitutional separation of the federal and state powers makes it essential that no state be permitted to exercise, without authority from Congress, those functions which it has delegated exclusively to Congress."

In 56 Dickinson's Law Review at page 107, the decisions in the Memphis Gas Co. and the Spector case are compared in an article entitled "The Implications of the Spector Motor Service case."

"In the Spector case the maintenance of terminals, pickup trucks, employees, etc. was primarily for the purpose of facilitating the flow of freight from Connecticut across its borders. In the Memphis case, the maintenance of compressing stations, maintenance men and other employees was for the sole purpose of facilitating the flow of gas across its border. What then is the difference in these two cases? Obviously, it is by reason of the fact that in the Spector case the tax was imposed on the privilege of engaging in interstate com-

merce, whereas in the Gas Company case the tax was imposed as a recompense for the protection of the property of the Company in that state, the former illegal; the latter valid, the former objectionable to the commerce clause of the U. S. Constitution; the latter not objectionable."

We find no merit in appellant's insistence that this case is not governed by the Spector case because in the Spector case the tax was placed "unequivocally upon the corporation's franchise for the privilege of carrying on exclusively interstate transportation in the State." In the dissenting opinion by Justice Reed in Interstate Oil Pipe Line Co. v. Stone, supra, 337 U.S. at page 677, 69 S.Ct. at page 1272, it is stated, "Phrased in terms of a privilege for carrying on an interstate business, such a tax historically has been deemed unconstitutional. The cases abound in statements to the effect that the privilege of carrying on interstate commerce itself is immune from state taxation. This is because it is a privilege beyond the power of a state to grant. '* * * it is a right which every citizen of the United States (and every corporation) is entitled to exercise under the constitution and laws of the United States; * * *'. Crutcher v. [Commonwealth of] Kentucky, 141 U.S. 47, 57, 11 S.Ct. 851, 853, 35 L.Ed. 649; International Textbook Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678. The cases hold not only that a state may not exact a tax as a condition precedent to the doing of interstate business, but also that it may not levy privilege, excise or franchise taxes on a foreign corporation for the privilege of carrying on or the actual doing of solely interstate business after its admission to the state."

■ We are of the opinion that as applied to appellee the license tax was not sought to be imposed by the City of Gadsden upon a local incident, but was a privilege tax for the carrying on of appellee's business of transportation in interstate commerce, and under the foregoing principles it was without authority to levy such tax. The judgment is affirmed.

Affirmed.